884 F.2d 445
 58 USLW 2156
 The STATE OF NEVADA, Plaintiff-Appellant,
v.
Samuel K. SKINNER* Secretary of Transportation
for the United States; and A.J. Horner, Chief of
the Nevada Division of the Federal
Highway Administration,
Defendants-Appellees.
 No. 88-2486.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 29, 1989.
Decided Aug. 31, 1989.
 
 Brian McKay, Atty. Gen. of Nevada, Carson City, Nev., Brooke A. Nielsen, Chief Deputy Atty. Gen., Nevada Dept. of Transp., Carson City, Nev., for plaintiff-appellant.
 Shirley Smith, U.S. Attys. Office, Reno, Nev., Sandra M. Schraibman, Leonard Schaitman, and Robert V. Zener, Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before TANG, REINHARDT and WIGGINS, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 This case raises the first challenge to the constitutionality of the national speed limit. The constitutional question is a fundamental one involving the distribution of powers between the federal government and the states. After fully considering the relevant issues, we decide in favor of the federal government and uphold the national speed limit.
 
 
 2
 In 1916, Congress enacted the Federal Aid Highway Act ("the Highway Act"). Under the Highway Act, the Federal Government provides funds directly to the States for maintenance of their highways. In 1973, Congress passed the Emergency Highway Energy Conservation Act which was permanently codified as a part of the Highway Act. It required the States as a precondition to receiving federal funds to post a maximum speed limit of 55 miles per hour (mph) on all highways, including secondary roads that were not directly part of the interstate network. While Congress did not order the States to conform their speed limits to the new national standard, it imposed a draconian consequence for noncompliance, denial of all future federal highway grants.
 
 
 3
 The events giving rise to the current controversy began in June of 1985. In that month, the Nevada state legislature passed legislation increasing the speed limit on Nevada highways. See 1985 Nev.Stats. 678 Sec. 3, codified at Nev.Rev.Stats. Sec. 484.369 (1985). The new statute, inter alia, permitted the Nevada Department of Transportation (Nevada DOT) to post a limit of 70 mph. Because of the state's concern over the reaction of the federal government, the statute contained a self-executing sunset provision. It required the 70 mph limit to be lowered to the national speed limit if and when federal officials threatened to cut off state highway aid.
 
 
 4
 Section 484.369 went into effect on July 1, 1986. Acting pursuant to their statutory authority, officials of the Nevada DOT established a 70 mph speed limit on a thirty-three mile stretch of Interstate Highway 80 (I-80) between the East Farley Interchange and the I-80 junction with I-95 west of Lovelock, Nevada at 7:30 a.m. on July 1. The federal government responded with alacrity. Approximately sixty seconds after the state's action, appellee A.J. Horner, Chief of the Nevada Division of the Federal Highway Administration, formally advised the Nevada DOT that all future federal funds for state highways would be withheld unless the state reduced the I-80 speed limit so as to comply with the national speed limit. Concurrent with this notice, the 70 mph limit expired by its own terms.[1]
 
 
 5
 Nevada sued in United States District Court for injunctive and declaratory relief against enforcement of 23 U.S.C. Sec. 154. The state contended that because the Highway Act threatened withholding of approximately 95% of all of Nevada's highway funds, it had no real choice but to comply with the national speed limit provisions. Consequently, Nevada argued, the national limit violated the "coercion" limitation on the Federal Government's Spending Power. The district court rejected this argument and ordered summary judgment for the United States. Nevada appealed, and we affirm.
 
 I. The Coercion Test in the Abstract
 
 6
 Article I specifically grants the Spending and Taxing Powers to Congress. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, Sec. 8, cl. 1. Pursuant to this authority, Congress may condition the receipt of funds, by states or others, on compliance with federal directives. The Supreme Court has clearly, and repeatedly, declared that "Congress may further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 448, 474, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)). Moreover, Congress frequently, and with an almost unblemished record of success,[2] has under its spending authority promulgated legislation in pursuit of the general welfare that reaches beyond its other enumerated Constitutional powers. See South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987) (collecting cases).
 
 
 7
 There are, however, limits upon the scope of the Spending Power. The Supreme Court has articulated at least four such restrictions. First, the exercise of the spending power must be in pursuit of the general welfare. See Oklahoma v. Civil Service Comm'n, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947); Helvering v. Davis, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937). Second, the conditions on receipt of federal funds must be reasonably related to the articulated goal. South Dakota v. Dole, 107 S.Ct. at 2796. Third, Congress' intent to condition funds on a particular action must be authoritative and unambiguous, "enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). Fourth, the federal legislation may be invalid if an independent constitutional provision bars Congressional actions. The independent constitutional bar rule "stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional." South Dakota v. Dole, 107 S.Ct. at 2798.
 
 
 8
 Nevada does not seriously rely on any of these restrictions.[3] Instead, it bases its claim on the indistinct coercion limitation first articulated in Steward Machine Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 893, 81 L.Ed. 1279 (1937) and most recently mentioned in South Dakota v. Dole, 107 S.Ct. at 2798. "Our decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.' " Id. (quoting Steward Machine, 301 U.S. at 590, 57 S.Ct. at 892). But cf. New Hampshire Department of Employment Security v. Marshall, 616 F.2d 240, 246 (1st Cir.1980) ("the carrot has [not] become a club because rewards for conforming have increased"). According to the coercion theory, the federal government may not, at least in certain circumstances, condition the receipt of funds in such a way as to leave the state with no practical alternative but to comply with federal restrictions.
 
 
 9
 Appellant argues that the threatened loss of 95% of its highway funds deprives it of any real choice; practically, it is forced, it says, to adhere to the national speed limit.[4] Ultimately, Nevada argues, the federal government's legislation would deprive the state of its sovereignty and violate principles of federalism.
 
 
 10
 The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party. See Oklahoma v. Schweiker, 655 F.2d 401, 406 (D.C.Cir.1981) ("although there may be some limit to the terms Congress may impose, we have been unable to uncover any instance in which a court has invalidated a funding condition"). Certainly, one reason for the federal courts' lack of enthusiasm for the theory is its elusiveness. Nevada, while baldly stating that withholding 95% of highway funds constitutes "coercion," has not given us any principled definition of the word. We can hardly fault appellant, however, because our own inquiry has left us with only a series of unanswered questions. Does the relevant inquiry turn on how high a percentage of the total programmatic funds is lost when federal aid is cut-off? Or does it turn, as Nevada claims in this case, on what percentage of the federal share is withheld? Or on what percentage of the state's total income would be required to replace those funds? Or on the extent to which alternative private, state, or federal sources of highway funding are available? There are other interesting and more fundamental questions. For example, should the fact that Nevada, unlike most states, fails to impose a state income tax on its residents play a part in our analysis? Or, to put the question more basically, can a sovereign state which is always free to increase its tax revenues ever be coerced by the withholding of federal funds--or is the state merely presented with hard political choices?[5] The difficulty if not the impropriety of making judicial judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between federal and state governments.[6]
 
 
 11
 Moreover, we would seriously question the vitality of the coercion test in light of the Supreme Court's holding in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). See infra Sec. III. The purpose of the coercion test is to protect state sovereignty from federal incursions. If this sovereignty is adequately protected by the national political process, we do not see any reason for asking the judiciary to settle questions of policy and politics that range beyond its normal expertise. See Oklahoma v. Schweiker, 655 F.2d at 414.
 
 
 12
 Fortunately, under the facts of this case, we need not decide whether the coercion theory survives both its own doctrinal failings and recent changes in constitutional theory adopted by the Court. We hold, instead, that (1) if Congress has the authority under an enumerated power (other than the Spending Power) to compel the States through direct regulation to change its practices, then it may also achieve that result through the more gentle commands of the Spending Power, and (2) in this case, Congress could have relied on its authority under the Commerce Clause to establish a national speed limit.
 
 
 13
 II. The Coercion Test and the Commerce Clause
 
 
 14
 We first explain why the provisions relating to the national speed limit must be upheld if Congress could impose those limits under an enumerated power, other than the Spending Power.[7] The central debate of the Spending Power cases has always been whether Congress may exercise authority beyond the strict limitations imposed by the other enumerated powers specified in the Constitution. See Butler, 297 U.S. at 66, 56 S.Ct. at 319. See generally Rosenthal, Conditional Federal Spending and the Constitution, 39 Stan.L.Rev. 1103 (1987). No one has yet questioned the right of the federal government to act, under the Spending Power,[8] within the ambit of those other enumerated powers. Certainly, Congress may use its Spending Power to encourage states to participate in cooperative and voluntary ventures within the parameters of the Commerce Clause. "The reach of the Spending Power, within its sphere, is at least as broad as the regulatory powers of Congress. If, pursuant to its regulatory powers, Congress could have achieved the objectives of the [Minority Business Enterprise] program, then it may do so under the Spending Power." Fullilove v. Klutznick, 448 U.S. 448, 475, 100 S.Ct. 2758, 2773, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.).
 
 
 15
 Nevada, however, argues that the federal government cannot engage in coercive conduct in the exercise of its Spending Power, even when the particular exercise is within the limitations of the Commerce Clause. We see two overriding arguments for rejecting appellant's theory, aside from the dubious vitality of the coercion test. First, if Congress has the authority under the Commerce Clause to order a state directly to comply with a particular standard such as a 55-mile-per-hour speed law, we see no reason why Congress should be prohibited from reaching that same result indirectly by withholding funds if the state fails to comply with that standard. Withholding funds is simply a lesser form of coercion than enacting a flat Congressional mandate with which a state is obligated to comply. A contrary view would elevate the form of the legislation over its function.
 
 
 16
 Second, we think appellant's claim can be answered by reference to the purpose of the coercion test. The coercion test flows from a fear that the federal government could wield its Spending Power to infringe upon integral state functions. The test serves, in theory, as a protection of the federalist system. However, if the congressional action passes muster under the Commerce Clause (or some other non-Spending power) and the restraints of the Tenth Amendment, see infra Secs. III and IV, there can be no reason to fear that the federal government is unconstitutionally intruding into areas of uniquely state concern. Since, as we explain below, no federalism concerns are implicated, the presence or absence of coercion is wholly irrelevant.
 
 
 17
 In short, if the Highway Act can be sustained under the Commerce Clause, the coercion test is simply inapplicable, whether or not that test applies in Spending Power cases not involving actions within the scope of the other enumerated powers.
 
 
 18
 III. The National Speed Limit and the Commerce Clause
 
 
 19
 The Commerce Clause[9] forms the broadest base of Congressional power. The power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." Gibbons v. Ogden, 9 Wheat 1, 196, 6 L.Ed. 23 (1824). Not only does Congress have authority over the instrumentalities of and products in interstate channels, it may regulate activities "affecting commerce," even if, by themselves, the activity is purely intrastate in character. Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). See also Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); Wickard v. Filburn, 317 U.S. 111, 127-28, 63 S.Ct. 82, 90-91, 87 L.Ed. 122 (1942).[10]
 
 
 20
 In determining whether Congress has exceeded its plenary authority under the Commerce Clause, our inquiry is a narrow one. A congressional finding that an activity affects interstate commerce must be afforded controlling deference if there is a rational basis for that judgment. See Katzenbach v. McClung, 379 U.S. 294, 303-04, 85 S.Ct. 377, 383-84, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964).[11] Here, where Congress has determined that there is a concrete link both between highways and interstate commerce and between the national speed limit and economic development,[12] we start with a strong presumption that the collective wisdom of the legislature is correct.
 
 
 21
 Applying the Commerce Clause test to this case, we can easily see the links between the national speed limit and interstate commerce. First, the interstate highways,[13] and the feeder roads that serve them, are the arteries of national commerce. See Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). It takes only a glance at our interstate highways to realize that a substantial portion of this country's trade passes over them. The mere fact that control of traffic on these roads may significantly affect our economy would justify the federal government's exercise of plenary authority in devising ways to preserve that commerce. Even when Congress has not preempted the field and the Commerce Clause lies dormant, state regulations that adversely infringe upon the movement of goods and services along these key paths may violate the Constitution. Id. In light of these facts, we can hardly say that when Congress acts to secure safe and efficient passage over the roads that it is acting outside the boundaries of its authority.[14]
 
 
 22
 Even when Congress seeks to achieve a goal within the purview of the Commerce Clause, its methods of implementation must be rationally related to meeting that goal. See Heart of Atlanta Motel, 379 U.S. at 262, 85 S.Ct. at 360. Nevada suggests that Congress could not have been acting rationally in aid of the Commerce Clause because the lower national speed limit would inhibit rather than promote rapid commercial intercourse. This argument is clearly without merit; Congress is entitled to determine that a lower speed limit--as well as a uniform one--facilitates the safe passage of commerce through the several states. Certainly, no one could quibble with the judgment that commerce that proceeds safely is more efficient than commerce slowed by accident or injuries.
 
 
 23
 Second, the principal motivating force behind the national speed limit was the fears generated by the Arab Oil Embargo of the early 1970s. The petroleum embargo sponsored by the Organization of Petroleum Exporting Countries (OPEC) damaged the economies of the Western powers, leading to one of the worst recessions of this century. See generally Danielson, The Evolution of OPEC, 201-33 (1982) (discussing impact of energy crisis on economies of developed countries). See also FERC v. Mississippi, 456 U.S. 742, 757, 102 S.Ct. 2126, 2136, 72 L.Ed.2d 532 (1982). Part of the Congressional reaction was to impose a lower national speed limit in order to conserve fuel and, thereby, revitalize commerce and protect the national defense. See 1973 U.S.Code Cong. & Admin.News 3344.[15] In light of the dramatic influence the energy crisis has had on the shape of American and international commerce, the 55 mph speed limit was a reasoned response on the part of Congress to the many serious problems posed by the crisis.[16]
 
 
 24
 Nevada virtually concedes that Congress had the authority to change the speed limit in response to international economic developments. However, appellant argues that the fact that Congress chose to raise the speed limit in 1987 to 65 mph on some roads signaled the end of the energy crisis and its impact on interstate commerce. Although the emphasis of the national speed limit has shifted somewhat over time, it is the function of Congress, and not the courts, to determine whether and when the national economic crisis provoked by the oil embargo and the resulting market dislocation has ended. Moreover, Congress may certainly conclude that, even if there is no present emergency, there exists a long-term relationship between energy conservation and commercial development. The mere fact that Congress has chosen to alter in limited respects the speed limit suggests only that shifts in energy policy, and advances in energy technology, now permit a different balance between conservation, safety, and quicker travel. Congress has made its legislative determinations, and we are in no position to second-guess them.
 
 
 25
 We conclude that the 55/65 mph limit is rationally related to the Congressional goals that underlie the Highway Act and that those goals fall within the purview of the Commerce Clause. Thus, absent a Tenth Amendment bar, Congress had the power, under that clause, to adopt the national speed limit.
 
 
 26
 IV. The National Speed Limit and the Tenth Amendment
 
 
 27
 Even if the national speed limit falls within the broad ambit of the Commerce Clause, there may remain limitations on the exercise of federal power within this zone of authority. See generally L. Tribe, American Constitutional Law 378-88 (2d ed. 1988). Appellant argues that the Tenth Amendment[17] carves out a sphere of state influence upon which even the Commerce power may not intrude. We disagree.
 
 
 28
 The Supreme Court's decision in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) answers appellant's concerns. In Garcia, the Court rejected the theory articulated in National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976) that the federal government was powerless to enforce legislation against the States in "areas of traditional government functions." It replaced the state functions test of Usery with a process-based analysis of Tenth Amendment limitations. "[T]he principal and basic limit on the federal commerce power is that inherent in all congressional action--the built-in restraints that our system provides through state participation in federal government action." Garcia, 469 U.S. at 556, 105 S.Ct. at 1020.[18] Since the representatives of the States and local interests comprise the constituent parts of the federal government, "[t]he political process ensures that laws that unduly burden the States will not be promulgated." Id. Consequently, absent any "extraordinary defect" in the national political process, Nevada's forum for raising a claim of infringed sovereignty lies with the legislature, not the judiciary. See South Carolina v. Baker, 108 S.Ct. at 1360 (plurality opinion). Although the contours of the "extraordinary defect" test remains fuzzy, suffice it to say that Nevada has not alleged that it was excluded from the national political process or that it was "singled out in a way that left it politically isolated and powerless." Id. at 1361 (citing United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938)).
 
 
 29
 Moreover, even if we were to apply the traditional government test of Usery, we do not believe that the national speed limit would infringe upon any integral state function. While the federal courts have, on occasion, given "lip service" to the notion of state control over roads, it has most frequently done so in the context of striking down state legislation as a burden on interstate commerce. See, e.g., Navajo Freight Lines, 359 U.S. at 523, 79 S.Ct. at 964 (striking down Illinois mud-flap regulation despite States "broad and pervasive" authority over highways). Nor is the federal government a newcomer to this field. Congress first promulgated the Federal Aid Highway Act in the first years of this century, and the task of building the Interstate Highway System has been an endeavor spanning four decades. Thus, the control of roads and highways has not traditionally fallen under plenary state control but under the cooperative agreement of state, local, and federal officials. Even during the brief ascendancy of the National League of Cities doctrines, courts frequently upheld federal regulation of state highways. See, e.g., Friends of the Earth v. Carey, 552 F.2d 25, 38 (2d Cir.1977) ("[t]he regulation of traffic on roads and highways, with its strong regional and interstate character ... has long been considered to be a cooperative effort between City, State and federal authorities, with no single entity being able to provide or impose a comprehensive traffic system, and with federal power, where necessary, taking precedence ") (emphasis added).[19] Cf. United Trans. Union v. Long Island R.R. Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (upholding federal regulation of railroads).
 
 
 30
 Finally, appellant argues that the federal regulations in force here effectively "commandeered" its regulatory power and required it to enforce unwillingly the national speed limit with state personnel and local resources. This, it argues, violates the Tenth Amendment rule laid out in Federal Energy Regulatory Comm'n v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982).[20] As a preliminary matter, we express substantial doubt as to whether FERC has survived the Supreme Court's decision in Garcia. "The extent to which the Tenth Amendment claim left open in FERC survives Garcia or poses constitutional limitations independent of those discussed in Garcia is far from clear." South Carolina v. Baker, 108 S.Ct. at 1361 (plurality opinion). The FERC Tenth Amendment claim rested on the same pillar of interference with state sovereignty as the theory rejected in Garcia, and there is, therefore, no apparent reason to think that the answer to that claim would now be any different than the answer given by the Supreme Court in Garcia. As that opinion teaches, Nevada's complaints regarding cooption of state resources must be resolved in the legislative process; it is that process which protects the fundamental interests of the states.
 
 
 31
 Even if pieces of FERC survive the Garcia decision, we do not believe that reversal would be required here. In FERC, the Supreme Court suggested that there may be some limits on the power of the federal government to use state regulatory machinery for its own ends. 456 U.S. at 759, 102 S.Ct. at 2137. However, the Court went on to hold that the provisions of Public Utilities Regulatory Policies Act (PURPA) did not run afoul of that rule because PURPA only required the state administrative agency to participate in its customary form of activity. Id. at 760, 102 S.Ct. at 2137. See also Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Similarly, in this case, the national speed limit requires the state police to enforce a standard only marginally different from the ordinary state rule. The state regulatory machinery is not diverted from its regular duties but continues to enforce the identical type of rule it has traditionally implemented. That the specific speed limit it now enforces results indirectly from a federal statute instead of exclusively from a state statute has little or nothing to do with the nature of the function performed by the state officers.[21] To hold that FERC controls here would be to "allow the States to disregard both the preeminent position held by federal law throughout the Nation, cf. Martin v. Hunter's Lessee, 1 Wheat. 304, 340-41, 4 L.Ed. 97 (1816), and the congressional determination that the federal rights ... can appropriately be enforced through state adjudicatory machinery." FERC, 456 U.S. at 761, 102 S.Ct. at 2138. Even assuming that FERC has not outlived its usefulness, we think it clear that the national speed limit does not unconstitutionally disrupt the state regulatory machinery.
 
 V. Conclusion
 
 32
 Nevada has pegged its attack on the national speed limit on the wobbly legs of the coercion test. While we strongly doubt the vitality of that theory, we conclude that, alive or dead, it is of no consequence here. Congress could have mandated a national speed limit under its Commerce power: that it chose to enact a lesser restraint, by cutting off highway funds to states unwilling to adopt the designated limit, does not render its actions unconstitutional.
 
 
 33
 AFFIRMED.
 
 
 
 *
 Samuel K. Skinner, Secretary of Transportation, has been substituted for his predecessors, Elizabeth Dole and James M. Burnley II, in accordance with Federal Rule of Appellate Procedure 43(c)(1)
 
 
 [1]
 In 1987, after the fears of oil consumption that fueled the 1973 amendment receded to a degree, Congress again amended the Act. This time, it permitted the States to post a speed limit of 65 mph in low population density areas. Nevada argues that the change in the law does not affect the suit because the revised 55/65 mph limit would still conflict with the 70 mph state enactment. The United States has expressed no disagreement with appellant on this point
 
 
 [2]
 Almost all the reservations about the permissible scope of the federal spending authority have come not from courts but from commentators. In fact, the parties have cited to us only one case--the generally discredited Supreme Court opinion in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936) which overturned part of President Roosevelt's New Deal--which declined to interpret expansively the congressional spending power. Commentators, however, have expressed greater doubts about the propriety and wisdom of conditioning federal largesse on compliance with federal policy. For some good general discussions, see Rosenthal, Conditional Federal Spending and the Constitution, 39 Stan.L.Rev. 1103 (1987); Kaden, Politics, Money, and State Sovereignty: The Judicial Role, 79 Colum.L.Rev. 847 (1979); Lacovara, How Far Can the Federal Camel Slip Its Nose Under the Academic Tent?, 4 J.Coll. & U.L. 223 (1977)
 
 
 [3]
 In its brief, Nevada contends that the Highway Act is not reasonably related to any principles of general welfare. We think it clear that the legislation is reasonably designed to serve the general welfare, especially since the "concept of welfare or the opposite is shaped by Congress...." South Dakota v. Dole, 107 S.Ct. at 2797 (quoting Helvering v. Davis, 301 U.S. at 645, 57 S.Ct. at 910). Our analysis of the relationship between the Highway Act and the Commerce Clause confirms our conviction. See infra Sec. III
 
 
 [4]
 Nevada specifically contrasts this case with the situation in South Dakota v. Dole, where the punishment for not adhering to the national drinking age was the loss of only 5% of the funding from certain specified federal highway programs. 107 S.Ct. at 2798
 
 
 [5]
 Nevada is, of course, free to raise tax funds in the manner of its own choosing. At present, the people of Nevada have decided, through their elected representatives, not to impose an income tax. However, such restrictions--whether they be in the form of state statutory or constitutional legislation or merely a failure to act--are entirely self-imposed, and the state, as a sovereign entity, is free to change its method of generating public income whenever the people wish to do so
 
 
 [6]
 As Professor Tribe has noted, the distinction between unlawful coercion and lawful pressure outlined in Butler "proved unworkable, and since its decision upholding the Social Security Administration, the Supreme Court has effectively ignored Butler in judging the limits of congressional spending power." L. Tribe, American Constitutional Law 249 (footnotes omitted)
 
 
 [7]
 This argument was offered by the United States to the Supreme Court in South Dakota v. Dole. The federal government argued that the Twenty-First "Amendment ... would not prevent Congress from affirmatively enacting a national minimum drinking age more restrictive than that provided by the various state laws; and it would follow a fortiori that the indirect inducement involved here is compatible with the Twenty-First Amendment." 107 S.Ct. at 2795. The Court, however, expressly declined to reach the issue. Id. at 2795-96
 
 
 [8]
 We have accepted, for the purposes of this opinion, the decision of the parties to frame the Highway Act as an exercise of the Spending Power. However, Congress has noted that the Highway Act serves "local and interstate commerce ... national and civil defense," and there is substantial doubt that the Highway Act can be accurately portrayed only as an exercise of one enumerated power. We, however, do not think that mining history for evidence of legislative intent is useful exercise. Congress is not required to identify the precise source of its authority when it enacts legislation. It is the duty of Congress to promulgate legislation, and it is the function of the courts to determine whether Congress has acted within the bounds of federal power
 
 
 [9]
 The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes." U.S. Const., Art. I, Sec. 8, cl. 3
 
 
 [10]
 Wickard v. Filburn is, of course, the quintessential example of the broad scope of the Congressional power over commerce. In Wickard, Congress sought to regulate wheat production that was solely for home consumption. The Supreme Court upheld the direct regulation on the theory that the tyranny of small decisions about inclusion or exclusion of home production from the national market could affect national price and supply
 
 
 [11]
 In this case, Congress made explicit findings about the interrelationship between interstate highways, speed limits, and commerce. See 1956 U.S.Code Cong. & Admin.News 2822
 
 
 [12]
 The Supreme Court long ago abandoned the traditional distinction between commerce and other forms of economic interactions. In the place of this rigid dichotomy, the Court has adopted a theory that recognizes the interdependence between commerce and other types of economic relationships. Compare United States v. E.C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895) ("Commerce succeeds to manufacture and is not part of it") with NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (integration of labor relationships and commerce)
 
 
 [13]
 We are primarily concerned with the interstate highway system here because Nevada chose to post the 70 mph speed limit on a strech of I-80 that is part of the Interstate Highway System
 
 
 [14]
 The legislative history of the Emergency Highway Energy Conservation Act, which was ultimately codified within the Federal Aid Highway Act, shows that it was initially conceived of primarily but not exclusively as an energy saving device. However, as concerns over energy shortfalls dwindled over time, the legislation has become increasingly viewed as a safety measure. Consequently, we address both aspects of the 55/65 mph speed limit
 
 
 [15]
 The Emergency Highway Energy Conservation Act of 1973 was only one of many bills passed by Congress that year in an attempt to control the adverse effects of the energy crisis. See, e.g. the Trans-Alaskan Pipeline Act and the Emergency Petroleum Allocation Act
 
 
 [16]
 We need not consider here Congress' authority to act under its national defense powers
 
 
 [17]
 We use the Tenth Amendment "to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution." South Carolina v. Baker, 485 U.S. 505, 108 S.Ct. 1355, 1360 n. 4, 99 L.Ed.2d 592 (1988). See also Note, Does the Tenth Amendment Pose Any Judicial Limit in the Commerce Clause After Garcia v. San Antonio Metropolitan Transit Authority and South Carolina v. Baker, 1989 B.Y.U.L.Rev. 231 (1989)
 
 
 [18]
 The theory in Garcia flowed from a seminal law review article which argued that the principal method of protecting federalism rested in the make-up of the federal government itself. See Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum.L.Rev. 543 (1954)
 
 
 [19]
 The Second Circuit, in Friends of the Earth, noted that the Supreme Court in Usery had specifically reaffirmed its decision in United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936) (railroads within scope of Commerce Clause power). The Usery Court distinguished the California case on the ground that the interstate character of the railroad system proved that it was not regarded as an integral part of the state's governmental activities
 
 
 [20]
 See also Maryland v. EPA, 530 F.2d 215 (4th Cir.1975), vacated and remanded on grounds of mootness sub nom. 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); District of Columbia v. Train, 521 F.2d 971, 992 (D.C.Cir.1975), vacated and remanded on grounds of mootness sub nom. Environmental Protection Agency v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); Brown v. EPA, 521 F.2d 827 (9th Cir.1975), vacated and remanded on grounds of mootness, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977)
 
 
 [21]
 This case closely follows the particular facts of South Dakota v. Dole. However, there, the Court, in discussing the Tenth Amendment limitations on the national drinking age rule, did not even mention that the FERC rule stood as a potential barrier to federal legislation. 107 S.Ct. at 2798