23 F.3d 80
 91 Ed. Law Rep. 82
 VIRGINIA DEPARTMENT OF EDUCATION, Petitioner,
v.
Richard W. RILEY, United States Secretary of Education;
United States Department of Education, Respondents.
Mental Disabilities Law Clinic of the T.C. Williams School
of Law; Virginia School Boards Association;
Fairfax County School Board, Amici Curiae.
 No. 94-1411.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 20, 1994.
Decided April 29, 1994.
 
 William Henry Hurd, Deputy Atty. Gen., Office of the Atty. Gen. of Virginia, Richmond, VA, argued (James S. Gilmore, III, Atty. Gen., Paul J. Forch, Sr. Asst. Atty. Gen., Joan W. Murphy, C. Tabor Cronk, Howard P. Estes, Jr., Asst. Attys. Gen., Office of the Atty. Gen. of Virginia, on pleadings), for petitioner.
 Marie K. McElderry, U.S. Dept. of Justice, Washington, DC, argued (Helen F. Fahey, U.S. Atty., Robert W. Jaspen, Asst. U.S. Atty., Richmond, VA, Deval L. Patrick, Asst. Atty. Gen., David K. Flynn, Linda F. Thome, U.S. Dept. of Justice, Washington, DC, on pleadings), for respondents.
 Kathe A. Klare, Director, Michael C. Guanzon, Sandra L. Karison, Jofelyn A. Ceballos, Joni A. Hong, University of Richmond Law School, Richmond, VA, for amicus curiae Mental Disabilities Law Clinic.
 Kathleen S. Mehfoud, D. Patrick Lacy, Jr., Hazel & Thomas, P.C., Richmond, VA, Richard Carter, McClure, Callahan, Carter & Atkins, Charlottesville, VA, for amicus curiae Virginia School Boards Ass'n.
 Thomas J. Cawley, Grady K. Carlson, John F. Cafferky, Hunton & William, Fairfax, VA, for amicus curiae Fairfax County School Bd.
 Before ERVIN, Chief Judge, and MURNAGHAN and WILKINSON, Circuit Judges.
 Petition granted by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge ERVIN and Judge MURNAGHAN joined.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case involves the statutory obligations of the United States to deal fairly with the recipients of funds under federal grant programs. Specifically, the question is whether the United States Department of Education can withhold more than $50 million in funding granted to the Commonwealth of Virginia under the Individuals with Disabilities Education Act, Subchapter II, 20 U.S.C. Secs. 1411-1420, without affording Virginia either notice or the opportunity for a hearing. Because we believe such a hearing is required under 20 U.S.C. Sec. 1416(a), and because no hearing has been held, we hereby direct the Department of Education to release Virginia's fiscal year 1994 grant. Additionally, any subsequent grants for the FY 1993-1995 grant period shall not be withheld until appropriate notice and a hearing have been provided.
 
 I.
 
 2
 Subchapter II of the Individuals with Disabilities Education Act ("IDEA-B") provides federal financial assistance to state and local education agencies for the education of disabled children. IDEA-B is administered by the Office of Special Education Programs ("OSEP"), within the Office of Special Education and Rehabilitative Services ("OSERS") of the Department of Education ("USDOE"). In order to receive funding under IDEA-B, a state must submit to the Secretary of Education a comprehensive "state plan" effective for a period of three fiscal years. See 20 U.S.C. Sec. 1413; 34 C.F.R. Sec. 300.110. In August 1992, the Virginia Department of Education submitted to OSEP the Commonwealth's plan for fiscal years 1993 to 1995. On October 29, 1992, the plan was "conditionally approved" by Robert Davila, Assistant Secretary of Education for OSERS. With that approval, Virginia could receive its grant for FY 1993, which commenced on July 1, 1992. The Commonwealth would also receive "full approval" of its three-year plan if it took several specific actions set out in the October 29 approval letter.
 
 
 3
 Included with the plan submitted by Virginia in August 1992 was a copy of the Virginia Board of Education's "Regulations Governing Special Education Programs for Handicapped Children and Youth in Virginia." Regarding discipline of disabled children, the regulations stated that "[i]f there is no causal connection [between a child's misconduct and his or her disability] and if the child was appropriately placed at the time of the misconduct, the child may be disciplined the same as a non-handicapped child." Despite the inclusion of this regulation in materials submitted prior to the plan's "conditional approval" at the end of October 1992, the USDOE waited until December 1993 to inform Virginia that its rule governing discipline of disabled children was contrary to Department policy.
 
 
 4
 On December 17, 1993, the USDOE notified the Virginia Department of Education that the state could not cease the provision of educational services to disciplined disabled children even if the discipline resulted from behavior unrelated to the child's disability. Relying on 20 U.S.C. Sec. 1412(1), which states that in order to qualify for IDEA-B assistance in any fiscal year, a state must demonstrate to the Secretary that it "has in effect a policy that assures all children with disabilities the right to a free appropriate public education," the USDOE claimed that the Commonwealth was required to provide education to all disabled students regardless of the reasons underlying a particular student's expulsion. The Secretary stated that the Department's position on the discipline of disabled children, although not formally published as a regulation, had been publicly circulated as early as 1989. As a result, the USDOE informed the Commonwealth that its 1993-1995 plan would be disapproved, and the earmarked funding discontinued, if Virginia failed to amend its regulations to comply with USDOE policy. The USDOE attributed its initial approval of Virginia's state plan to an "oversight" on its part.
 
 
 5
 In the months following, officials from Virginia's Department of Education and elected state officials attempted to persuade the USDOE to release Virginia's FY 1994 funds which had been conditionally approved in November 1993. At stake was all of Virginia's IDEA-B grant for FY 1994, totalling over $50 million. Virginia contended that its discipline policy for disabled students was educationally sound. The Commonwealth argued that under the USDOE's stated policy, a slightly impaired student who commits a violent act in school--an act totally unrelated to his or her disability--could never be deprived of free educational services. Virginia contended that Sec. 1412(1) did not support the Secretary's position because the very concept of public education presupposes that a student has not forfeited that right by committing an expellable act wholly unrelated to his or her handicap as defined by statute. Virginia further complained that programs serving the Commonwealth's 128,000 disabled students would be jeopardized by loss of the funds, while only 76 disabled students, all of whom had been provided with statutorily mandated due process protections, had been expelled for conduct unrelated to their disabilities.
 
 
 6
 The USDOE, however, was apparently unimpressed with Virginia's contentions, and on March 4, 1994, formally notified Virginia that the Secretary proposed to disapprove the Commonwealth's current three-year plan. On March 21, 1994, Virginia sought an administrative hearing to contest the proposed disapproval. See 20 U.S.C. Secs. 1413(c) & 1416(b)(1); 34 C.F.R. Sec. 300.584 et seq. At that time, the USDOE refused to release any of the FY 1994 funds to Virginia pending the administrative appeal, explaining that it lacked the authority to do so in the absence of plan approval. Furthermore, the USDOE stated that if Virginia amended its disciplinary policy in order to receive plan approval, then there would no longer be any basis to continue the administrative appeal. Accordingly, Virginia could not receive the funds under its FY 1994 grant while pursuing an administrative challenge to the USDOE's policy.
 
 
 7
 The Commonwealth of Virginia now petitions this court for interlocutory relief, seeking the release of its $50.2 million grant for FY 1994.
 
 II.
 
 8
 Before addressing the merits of petitioner's claims, we must first establish whether this court possesses jurisdiction to grant the requested relief. This issue is of concern here because the Commonwealth is seeking relief from an administrative action in the absence of a final order issued by the USDOE. Ordinarily, courts of appeals are limited to reviewing only the final determinations of agencies over which they exercise appellate review. Virginia contends that here, however, this court has jurisdiction under the All Writs Act, 28 U.S.C. Sec. 1651, to grant the relief sought.
 
 
 9
 It is well-settled that in rare instances an appellate court may act under the authority of the All Writs Act in granting interlocutory relief to a party aggrieved by administrative actions when the court would have full appellate jurisdiction following a final agency decision. See State of North Carolina, Envtl. Policy Inst. v. EPA, 881 F.2d 1250, 1256-57 (4th Cir.1989) (Phillips, J., in chambers); Gulf Oil Corp. v. Department of Energy, 663 F.2d 296, 312 (D.C.Cir.1981). See generally Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75 (D.C.Cir.1984). It is clear that this authority is to be exercised sparingly and that relief is not to be granted unless irreparable harm is likely. See Reynolds Metals Co. v. FERC, 777 F.2d 760, 762 (D.C.Cir.1985); Public Util. Comm'r v. Bonneville Power Admin., 767 F.2d 622, 630 (9th Cir.1985). The crucial inquiry in determining whether such relief is appropriate is whether the problem raised by petitioner "is one that can be safeguarded against in the very course of the ongoing administrative proceedings." North Carolina, Envtl. Policy Inst., 881 F.2d at 1257.
 
 
 10
 In the case before us, Virginia claims that the USDOE has failed to follow statutorily mandated procedures by withholding further funding without affording the Commonwealth notice and a hearing. Petitioner contends that the USDOE's actions leave it with a "Hobson's Choice": either accede to the USDOE's position, or forego more than $50 million in funding already allocated to the Commonwealth's special education programs. Acceding, according to USDOE, will deprive the Commonwealth of its right to test the lawfulness of its educational policy, because there is no right to a hearing once Virginia's plan has been approved. Not acceding brings a separate set of problems. Indeed, the harm petitioner will suffer if the funds continue to be withheld--even if only for a temporary period--is both significant and indisputable. According to Virginia's Superintendent of Public Instruction, William C. Bosher, Jr., continued denial of the funds will force school divisions "to lay off teachers and discontinue primary education services in order to operate within their appropriated funds." The unwillingness of the USDOE to consider petitioner's claims, coupled with the likelihood of irreparable harm in the absence of immediate action, makes this case one of those exceptional instances where jurisdiction under the All Writs Act is appropriately exercised.
 
 III.
 A.
 
 11
 We therefore turn to the issue of whether the USDOE's failure to provide Virginia with notice and a hearing prior to discontinuing the IDEA-B funding was in error. Section 1416(a) states, in pertinent part:
 
 
 12
 Whenever the Secretary, after reasonable notice and opportunity for hearing to the State educational agency involved ..., finds--
 
 
 13
 (1) that there has been a failure to comply substantially with any provision of section 1412 or section 1413 of this title, or
 
 
 14
 (2) that in the administration of the State plan there is a failure to comply with any provision of this subchapter or with any requirements set forth in the application of a local educational agency or immediate educational unit approved by the State educational agency pursuant to the State plan, the Secretary--
 
 
 15
 (A) shall, after notifying the State educational agency, withhold any further payments to the State under this subchapter....
 
 
 16
 20 U.S.C. Sec. 1416(a). Virginia argues that, under Sec. 1416(a) of the statute, it is entitled to notice and a hearing prior to being deprived of its FY 1994 funds. The USDOE contends that the procedural protections of Sec. 1416 are inapplicable here because Sec. 1416 applies only to the Secretary's funding decisions regarding states that already have fully approved plans. Given that the Commonwealth's plan received only conditional approval, the USDOE claims that Virginia is not entitled to the protections included in Sec. 1416. In essence, the USDOE contends that its refusal to release Virginia's FY 1994 funds is not a "withholding" under Sec. 1416 because Virginia was never actually entitled to that grant.
 
 
 17
 USDOE's reading of Sec. 1416 strikes us as too narrow. The USDOE would have us hold that Sec. 1416 applies only when it seeks to withhold funds from a state operating under an approved plan, but the language of Sec. 1416 does not support that conclusion. Rather, the procedures required by Sec. 1416 apply whenever the Secretary attempts to discontinue funding based on a perceived violation of IDEA-B's central provisions. Section 1416(a)(1) expressly includes failure to comply "with any provision of section 1412 or section 1413" as a basis for withholding further payments to the state, and it is for precisely that reason that the Secretary is now refusing to release Virginia's FY 1994 funds: the USDOE claims that Virginia's disciplinary policy violates the first requirement in Sec. 1412. Simply put, USDOE's decision to cut off funds allocated to Virginia, based on Virginia's noncompliance with the Department's disciplinary policy, constitutes a "withholding" of further payments under Sec. 1416, thereby requiring that Virginia be provided notice and the opportunity for a hearing before the funds are actually withheld.
 
 
 18
 That the language of the statute should require an administrative hearing here is not surprising. After all, Virginia's three-year plan had been "conditionally" approved by the OSERS more than a year before USDOE first challenged Virginia's disciplinary regulations. During the intervening period, the Commonwealth received its grant for FY 1993 and was allocated a set amount of funding for the next year. One would expect the Commonwealth to have relied on the allocated amounts in devising its annual budgets and in developing and implementing educational programs; apparently, Virginia did just that. As Dr. Bosher explains, the federal funds were "planned, budgeted, contracted and anticipated," and were earmarked for the payment of teacher aides, diagnosticians, therapists, social workers, interpreters, and other crucial personnel and programs. Similarly, the abrupt discontinuation of the funding "impose[d] substantial and unanticipated staffing and financial obligations upon local school divisions, without any advance opportunity to budget or plan for such obligations." According to one local school division, IDEA funds are needed to support 155 special education personnel positions in that division alone. In fashioning the notice and hearing requirements of Sec. 1416, Congress intended to avoid just this kind of state and local budgetary disruption.
 
 
 19
 The applicability of Sec. 1416's procedural protections to the withholding of Virginia's IDEA-B funds also promotes the long-standing policy that the federal government must clearly state any conditions accompanying the grant of funds to a state. See Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). As the Supreme Court has explained, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Id. at 17, 101 S.Ct. at 1540 (citations omitted).
 
 
 20
 If the federal government is given the unfettered discretion to change the conditions attendant to the grant of federal moneys after states have already chosen to participate in a program, states could be faced, as Virginia is here, with the unpalatable choice of losing budgeted funds or complying with conditions they find unacceptable. Because "states must not be left to guess at federal intentions in their own budgetary planning process," Mowbray v. Kozlowski, 914 F.2d 593, 598 (4th Cir.1990), agencies of the federal government cannot be permitted freely to change funding conditions right in the middle of a multi-year grant period. Allowing such mid-grant shifts would enable the federal government to overlook its obligation of fair dealing with the states in the administration of funding programs. This obligation has been clearly stated with respect to Congress, see Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540, and it is equally applicable to the agencies charged with administering federal grant programs.
 
 
 21
 Finally, we cannot accept USDOE's contention that it is not imposing a new condition on Virginia, but only implementing an established policy. USDOE communicated a lengthy list of conditions to Virginia when it conditionally approved Virginia's plan in October 1992, but the obligation to provide educational services to children expelled for reasons wholly unrelated to a disability was not among them. This condition is a new and potentially costly one, and any attempt to impose such a condition after a state has already chosen to participate in a grant program necessarily requires some procedural protections for the state involved--protections similar to those included in Sec. 1416(a) of the IDEA-B. Indeed, the statute and the regulations are replete with obligations mandating the process that states must provide to affected children. It seems only proper that a department which so emphasizes procedural fairness on the part of states would exercise that same fairness in its dealings with them.
 
 
 22
 The application of Sec. 1416's procedures to this case ensures that the federal government cannot change in mid-stream the conditions required of Virginia for the receipt of IDEA-B funds, funds which have already been "conditionally" approved and allocated, without first considering the Commonwealth's various objections to those new conditions. Providing Virginia with notice and the opportunity for an administrative hearing here will serve to diminish the possibility of arbitrary government action regarding allocated funds in the middle of a three-year grant period.
 
 B.
 
 23
 USDOE also claims that Virginia has not been deprived of statutory procedural protections because the Commonwealth is being afforded a hearing under Sec. 1413(c)(2).* The Department contends that the hearing provision of Sec. 1413(c), rather than that included in Sec. 1416(a), is applicable to proceedings concerning the disapproval of a state plan. At the Sec. 1413 hearing, the USDOE explains, Virginia will be free to express any objections it has to the Department's funding policies. At the same time, however, because Virginia's plan cannot be approved until the conclusion of that hearing, the Commonwealth is not entitled to any funds under IDEA-B while the administrative proceedings are in progress.
 
 
 24
 The problem with the USDOE's position is that Sec. 1413 does not speak to the case where a state's plan has been "conditionally" approved and funds have already been allocated and even paid under that plan. Section 1413(c)(2) applies where a state is submitting a new plan at the commencement of a three-year funding period and thus has no set expectations regarding amounts to be received during each of the years covered by the plan. The section's language does not anticipate that a state will already have received funding under the particular plan being evaluated. Furthermore, like all of the other sections of IDEA-B and all of the USDOE's regulations governing administration of the IDEA-B program, Sec. 1413 makes no mention of conditional approval.
 
 
 25
 Nonetheless, USDOE has relied on its development of the hybrid of "conditional approval" in claiming that it has created a form of approval under which it is free to release funds to a state, yet also free to discontinue funding at any time. While that result might be tenable if Sec. 1413 contained the only procedures a state could invoke under the IDEA-B, it is not consistent with the requirements of Sec. 1416. Refusing to grant funds allocated under a plan pursuant to which a state has already received funding during the grant period constitutes "withholding" of further payments whether the plan was fully approved or only conditionally approved. Either way, the result is the same: the state is losing access to funds allocated under a plan even though the state has previously received funding under that same plan. The USDOE attempts to avoid the straightforward application of Sec. 1416 by making it hinge on the type of approval which the state plan had received. The "withholding" language of Sec. 1416, however, depends on the existence of prior payments or allocations under the state plan, not on the plan's "level" of approval.C.
 
 
 26
 USDOE's failure to provide Virginia with notice and the opportunity for a hearing dictates that Virginia's FY 1994 grant not be withheld. The application of Sec. 1416(a) to this case requires that the USDOE provide Virginia with notice and the opportunity for a hearing prior to withholding any further payments to Virginia under the state's existing three-year plan. At that hearing, Virginia should be permitted to express its various challenges to the Secretary's proposed withdrawal of funding. Among those challenges, undoubtedly, will be Virginia's contentions concerning the validity of the Secretary's policy with regard to students expelled from school for reasons unrelated to a disability as well as the way in which that policy was adopted and imposed. We express no view on the merits of these questions. We hold only that the Department must follow statutorily mandated procedures before denying further funding to a participant in a federal-state grant program.
 
 
 27
 Both in oral argument and in a subsequent letter to this court, Virginia has stated that "as a condition of the court-ordered release of the federal funds and pending its appeal of the disputed federal policy, Virginia is prepared to continue special education services to disabled students expelled or suspended long-term for reasons unrelated to their disability." We agree that this solution will "preserve all interests before the Court," and we have acted on the assumption that Virginia will comply with its representation and that USDOE will release the disputed funds and provide Virginia a prompt hearing.
 
 IV.
 
 28
 There is no doubt that the states are the beneficiaries of the federal government's substantial largesse under the Individuals with Disabilities Education Act. There is similarly no doubt that the federal government is permitted to impose conditions on the states for the receipt of federal funds. The federal government also benefits from this arrangement, however, as it utilizes state educational systems to carry out important federal purposes. The result is akin to a contract between the federal government and each participating state. Each party to such a contract has the obligation to deal fairly with the other.
 
 
 29
 This court has no desire to interfere with the complex administration of a federal grant program. Here, however, one party to a statutory contract claims a material breach by its counterpart. An agency of the federal government has attempted to discontinue funding to Virginia, a participant in a federal-state grant program, without affording Virginia the most basic elements of due process. Congress itself has mandated that process, and USDOE is obligated to provide it. Accordingly, due to the absence of any administrative proceedings as required by 20 U.S.C. Sec. 1416, the Department is enjoined from withholding Virginia's FY 1994 grant. Additionally, in order for the USDOE to withhold any of Virginia's FY 1995 funds, it must first hold an administrative hearing in accordance with the plain provisions of Sec. 1416.
 
 
 30
 PETITION FOR INTERLOCUTORY RELIEF GRANTED.
 
 
 
 *
 Section 1413(c) states:
 (1) The Secretary shall approve any State plan and any modification thereof which--
 (A) is submitted by a State eligible in accordance with section 1412 of this title; and
 (B) meets the requirements of subsection (a) and subsection (b) of this section.
 (2) The Secretary shall disapprove any State plan which does not meet the requirements of paragraph (1), but shall not finally disapprove a State plan except after reasonable notice and opportunity for a hearing to the State.