REHEARING EN BANC GRANTED BY ORDER FILED
10/11/96; PUBLISHED OPINION FILED 6/19/96
IS VACATED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 95-2627
(94-76-0)

---

Commonwealth of Virginia Department of Education,

Petitioner,

versus

Richard W. Riley, etc., et al,

Respondents.

---

O R D E R

---

The Court amends its opinion filed June 19, 1996, as follows:

On page 29, line 5 of indented quotation -- the number "48" at the end of the quote is deleted.

On page 30, first paragraph, line 4 -- the comma after the words "state judges" is changed to a dash.

On page 31, footnote 9, line 11 -- the comma after the word "relies" is deleted.

For the Court - By Direction

/s/ Bert M. Montague

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF EDUCATION,
Petitioner,

v.

RICHARD W. RILEY, United States

No. 95-2627

Secretary of Education; UNITED
STATES DEPARTMENT OF EDUCATION,
Respondents.

VIRGINIA SCHOOL BOARDS
ASSOCIATION,
Amicus Curiae.

On Petition for Review of an Order
of the United States Department of Education.
(94-76-0)

Argued: April 4, 1996

Decided: June 19, 1996

Before MURNAGHAN and LUTTIG, Circuit Judges, and LAY,
Senior Circuit Judge of the United States Court of Appeals
for the Eighth Circuit, sitting by designation.

_____

Affirmed by published opinion. Judge Murnaghan wrote the majority
opinion, in which Senior Judge Lay joined. Judge Luttig wrote a dis-
senting opinion.

_____

**COUNSEL**

**ARGUED:** William Henry Hurd, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Petitioner. Leslie A. Simon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** James S. Gilmore, III, Attorney General, Paul J. Forch, Senior Assistant Attorney General, Joan W. Murphy, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Petitioner. Deval L. Patrick, Assistant Attorney General, Dennis J. Dimsey, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. D. Patrick Lacy, Jr., Kathleen S. Mehfoud, HAZEL & THOMAS, P.C., Richmond, Virginia, for Amicus Curiae.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Under Part B of the Individuals with Disabilities Education Act ("IDEA" or "IDEA-B"), federal funds are provided to participating states for the purpose of helping them to educate disabled children. In order to be eligible for the federal assistance, a state must meet numerous requirements prescribed by Congress, one of which is that the state "assure[ ] all children with disabilities the right to a free appropriate public education." After learning that Virginia has a policy under which a disabled child may be deprived of all educational services by way of expulsion or long-term suspension if that child misbehaves in a manner unrelated to his or her disability, the United States Department of Education threatened to withhold all of Virginia's IDEA-B funds unless it amended that policy so that expelled or suspended disabled children could receive educational services in an alternative setting. In Virginia Department of Education v. Riley (Riley I), 23 F.3d 80 (4th Cir. 1994), we ordered the Department to conduct a hearing on the matter. Following that hearing, the Secretary of Education ruled that Virginia's entire allotment of IDEA-B funds could indeed be withheld until the state agreed to amend its disciplinary policies. Virginia has appealed that ruling on numerous grounds. We affirm.

2

I.

A.

In Part B of the IDEA--formerly known as the Education of the Handicapped Act[1]--Congress has directed the Department of Education to provide financial assistance, under prescribed conditions, to state and local education agencies for the education of disabled children. See 20 U.S.C. §§ 1411-20 (1990 & Supp. 1996). The IDEA-B program is administered by the Office of Special Education Programs ("OSEP"), housed within the Department of Education's Office of Special Education and Rehabilitative Services ("OSERS"). 20 U.S.C. § 1402(a) (Supp. 1996). To receive IDEA-B funds, a state must do two things. First, the state must submit to OSEP a plan covering a period of three fiscal years, describing (among other things) the policies and procedures that will govern the expenditure of the federal funds. See 20 U.S.C. § 1413 (1990 & Supp. 1996); 34 C.F.R. § 300.110. Second, the state must meet the eligibility requirements described in the Act. One of those requirements is that the state have "in effect a policy that assures all children with disabilities the right to a free appropriate public education."[2] 20 U.S.C. § 1412(1) (Supp. 1996); see also 34 C.F.R. § 300.121(a) ("Each State plan must include information that shows that the State has in effect a policy that ensures that all children with disabilities have the right to FAPE [free appropriate public education] within the age ranges and timelines under § 300.122."). If the Secretary of Education determines, after notice and an opportunity for a hearing, that the state has failed substantially to comply with that or other requirements set out in sections 1412 and 1413, he or she "shall, after notifying the State educational

_____

[1] Congress changed the title of the Act in 1990. See Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, 104 Stat. 1103, 1141-42 (codified as amended at 20 U.S.C. § 1400(a) (Supp. 1996)).

[2] Congress stated that its purpose in enacting the legislation was "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c) (Supp. 1996).

agency, withhold any further [IDEA-B] payments to the State." 20 U.S.C. § 1416(a) (Supp. 1996).

## B.

In August 1992, Virginia submitted to OSEP its IDEA-B plan for fiscal years 1993, 1994, and 1995. The Assistant Secretary of Education for OSERS conditionally approved the plan in October 1992 and permitted Virginia to receive its funds for fiscal year 1993. The Department of Education thereafter discovered that Virginia has a stated policy under which, "[i]f there is no causal connection [between a child's misconduct and his or her disability] and if the child was appropriately placed at the time of the misconduct, the child may be disciplined the same as a non-handicapped child."[3] On December 17, 1993, the Department notified Virginia officials that it would not release Virginia's IDEA-B funds for fiscal years 1994 and 1995 unless Virginia altered that policy. Relying upon the Act's statement that a participating state must have "in effect a policy that assures all children with disabilities the right to a free appropriate public education," as well as upon the Department's prior interpretation of that provision, the Department asserted that "even during a disciplinary removal that exceeds 10 school days, [participating states] may not cease educational services to students with disabilities . . . regardless of whether the student's misconduct is determined to be a manifestation of the student's disability."

Virginia refused to amend its policy, insisting that, if a child's misbehavior is unrelated to his or her disability, IDEA-B does not strip school officials of their right to deprive the student of all educational services by expelling him or her or by suspending him or her for an extended period of time. After the Department refused to grant it a hearing on the matter, Virginia petitioned this court for interlocutory relief, seeking the release of its $50.2 million IDEA-B allotment for fiscal year 1994. We granted Virginia the relief it requested, holding that, under 20 U.S.C. § 1416(a), Virginia could not be deprived of its

_____

[3] An iteration of the policy appeared in the documents originally submitted by Virginia with its 1993-95 plan. The Department either did not notice or did not become concerned about the policy until many months later.

4

IDEA-B funds without reasonable notice and an opportunity for a hearing. Riley I, 23 F.3d at 84-87. The Secretary complied with that ruling, releasing the funds for fiscal year 1994 and ordering that a hearing be held concerning the disposition of the funds for fiscal year 1995.

In October 1994, a hearing was indeed held. The Hearing Officer found (1) that "IDEA-B requires states to assure that eligible students with disabilities suspended long-term or expelled for conduct unrelated to their disabilities continue to receive special education services;" (2) that the Department's policy on the matter had been articulated in the form of "an interpretive rule not subject to the notice and comment provisions" of the Administrative Procedure Act ("APA"); (3) that the Department's demand that Virginia amend its policy "did not amount to imposing [on Virginia] an impermissible new condition;" and (4) that the Secretary was acting within the scope of his lawful discretion when he proposed that Virginia's entire allotment of IDEA-B funds for fiscal year 1995, as well as all future IDEA-B funds, be withheld if Virginia refused to amend its policies in the manner demanded by the Department.

Pursuant to 34 C.F.R. § 300.585, the Secretary reviewed the Hearing Officer's findings, then issued his final decision on July 3, 1995. The Secretary largely concurred with the Hearing Officer's conclusions, finding (1) "that the IDEA-B, its interpretive guidance, and the case law require the continuation of education services to eligible disabled school children who are suspended long-term or expelled from their current school setting when their misconduct is unrelated to their disability;" (2) that "the Department's interpretation of IDEA-Part B is an interpretive rule not subject to the notice and comment provisions of the APA;" (3) that concerns we expressed in Riley I regarding whether the Department was imposing an impermissible new condition on Virginia were cured when Virginia was given the opportunity to present its arguments to the Hearing Officer; (4) that the Department was, in fact, not imposing such an impermissible new condition; (5) that Congress had given the Secretary the authority to withhold all of a state's IDEA-B funds if the state refuses to comply with the Act's requirements; and (6) that, despite those findings, Virginia would have access to its 1995 funds pending its appeal of the Secretary's decision.

5

Virginia has appealed, contending that Congress must clearly demonstrate its intent to override local authority concerning school disciplinary policies before the federal government may intrude in such matters, and that no such intent has been evinced here. Virginia also argues that the position taken by the Department in the instant case violates the "equal access" purpose of IDEA-B, that the Department is unlawfully coercing Virginia by threatening to withhold its entire IDEA-B allotment, and that the Department's policies cannot be imposed on Virginia because they were not promulgated in compliance with the APA.

C.

We must regard the Secretary's findings of fact as conclusive if they are supported by substantial evidence. 20 U.S.C. § 1416(b)(2). As we explain below, we find the pertinent statutory provisions unambiguous and therefore review the Secretary's conclusions of law de novo.[4] See Chevron U.S.A. v. Natural Resources Defense Council,

_____

[4] Virginia agrees that the Secretary's conclusions of law must be reviewed de novo. Its argument, though, is curious. Virginia believes that the terms of IDEA-B are unambiguous and that we therefore should not defer to the Secretary's interpretation of the statute, but should instead enforce the statute's plain meaning. Yet, as we suggest below, Virginia also believes that, when Congress said that participating states must have in place "a policy that assures all children with disabilities the right to a free appropriate public education," it really did not mean "all." Congress, in Virginia's view, intended that an exception be made for disabled students who have been expelled or suspended long-term due to misbehavior that is unrelated to their disabilities. To find that Congress intended that such an exception be made, we would have to find ambiguity in Congress's use of the word "all." And if ambiguity did inhere in the statute, the Secretary's interpretation of it would be entitled to substantial deference. See, e.g., Honig v. Doe, 484 U.S. 305, 325 n.8 (1988) (deferring to the Secretary's interpretation of the phrase "change in placement" in IDEA-B, see 20 U.S.C. § 1415(e)(3), because that phrase is ambiguous); Chevron U.S.A., 467 U.S. at 843-45 (holding that a court must defer to an agency's construction of a statute that the agency administers when Congress has not "directly spoken to the precise question at issue" and when the agency's interpretation of the statute is a reasonable one).

6

467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

II.

Virginia's principal contention on appeal has been that the authority of state and local school officials to discipline their students as they reasonably see fit can only be overridden by a federal agency when Congress has unambiguously authorized it to do so. Virginia has pointed out that education is an area "where States historically have been sovereign," United States v. Lopez, ___ U.S. ___, 115 S. Ct. 1624, 1632 (1995), and that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," Milliken v. Bradley, 418 U.S. 717, 741 (1974). Virginia believes that the Department of Education is trying to blunt one of school officials' most useful disciplinary tools: total exclusion from the education process by way of expulsion or long-term suspension. See Goss v. Lopez, 419 U.S. 565, 580 (1975) (observing that "[s]uspension is considered . . . to be a necessary tool to maintain order"). Virginia therefore contends that, because Congress has not clearly given it permission to do so, the Department cannot attempt to compel the state to alter its disciplinary policies by withholding its allotment of federal funds.[5]

The principles governing Congress's ability to place conditions on the states' receipt of federal funds are fairly well established. In South Dakota v. Dole, 483 U.S. 203 (1987), the Supreme Court acknowledged Congress's broad power, pursuant to its spending authority under Article I, Section 8,[6] to "attach conditions on the receipt of federal funds" in an effort "`to further broad policy objectives.'" Id. at

_____

[5] Contrary to Virginia's implicit suggestion, the Supreme Court has not articulated education-specific rules to be applied in the area of conditional federal spending. Virginia does employ the proper terms of analysis, however, insofar as it asks whether Congress has unambiguously spoken to the matter at issue.

[6] Clause 1 of Section 8 states, in pertinent part: "The Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States . . . ."

206 (quoting <u>Fullilove v. Klutznick</u>, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)). That power to place conditions on the receipt of federal funds is subject, though, to at least four restrictions: (1) Congress "must be in pursuit of `the general welfare,'" <u>id.</u> at 207; (2) Congress must unambiguously articulate the applicable conditions, thereby "`enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation,'"[7] <u>id.</u> (quoting <u>Pennhurst State Sch. and Hosp. v. Halderman</u>, 451 U.S. 1, 17 (1981)); (3) the conditions must be related "`to the federal interest in particular national projects or programs,'" <u>id.</u> (quoting <u>Massachusetts v. United States</u>, 435 U.S. 444, 461 (1978) (plurality opinion)); and (4) "other constitutional provisions may provide an independent bar to the conditional grant of federal funds,"[8] <u>id.</u> at 208. It is the second of those restrictions that Virginia believes precludes the Department's withholding of federal funds in the case at bar.

The principal issue in the instant case is therefore this: When Congress stated that all states receiving IDEA-B funds must have "in effect a policy that assures all children with disabilities the right to a free appropriate public education," did it clearly indicate that states receiving IDEA-B funds could not deprive a disabled student of all educational services, even if the student had been expelled or suspended due to conduct unrelated to his or her disability?

_____

[7] The Court has explained that

> legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."

<u>Pennhurst</u>, 451 U.S. at 17.

[8] The <u>Dole</u> Court rejected the notion that, absent undue coercion, the Tenth Amendment may constitute such an "independent bar." <u>See</u> 483 U.S. at 210 ("We have also held that a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants."). By making reference to "an independent bar," the Court meant only "that the [spending] power may not be used to induce the States to engage in activities that would themselves be unconstitutional." <u>Id.</u>

8

In order to answer that question, it is useful to review the facts underlying two of the Supreme Court's leading decisions in the area of conditional federal grants, Pennhurst and Dole. In Pennhurst, the Court reviewed the provisions of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, then codified at 42 U.S.C. §§ 6000 et seq.[9] Under the Act, the federal government offered to provide funds to the states in order to help them implement programs designed to care for and treat developmentally disabled individuals. 451 U.S. at 11. Each state could choose either to comply with the conditions set forth in the Act and thereby receive the federal funds or instead to forego the opportunity to participate in the program. Id. Six sections of the Act described, in explicit terms, the conditions a state was required to meet in order to receive federal support. Id. at 12-13, 23. A seventh section--section 6010, the so-called "bill of rights" section--contained Congress's findings with respect to the kinds of programs to which it believed individuals with developmental disabilities were entitled.[10] Id. at 13.

The Solicitor General contended that, in section 6010, Congress had prescribed conditions that a state must meet in order to receive federal funds under the Act. Id. at 22. The Court rejected that proposition on several grounds. First, unlike the six sections in which conditions had been expressly prescribed, Congress gave no express indication that section 6010 was intended to impose conditions. Id. at 23. Second, unlike the Solicitor General, the Department of Health and Human Services--the agency charged with administering the Act, id. at 11--had taken the position that the Department could not withhold federal funds if a state failed to act fully in accordance with section 6010's findings, id. at 23. Third, the small sum ($1.6 million) provided to the given state was "woefully inadequate to meet the enormous financial burden" of complying with each of section 6010's

_____

[9] The Act has since been substantially amended. All references are to the version of the Act then before the Court.

[10] Section 6010 stated, inter alia, that "[p]ersons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities," and that such "treatment, services, and habilitation . . . should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty." 451 U.S. at 13.

9

aspirations.**11** Id. at 24. Fourth, because much of the language of section 6010 was indeterminate, the Court found that Congress had not "spoke[n] so clearly that [the Court could] fairly say that the State could make an informed choice." Id. at 25. Finally, the Court believed that several other provisions of the Act would be rendered superfluous if the aspirations expressed in section 6010 were deemed to constitute conditions on the receipt of federal funds. Id. at 25-27.

In Dole, the State of South Dakota asked the Court to review federal legislation under which the Secretary of Transportation has been directed to withhold five or ten percent of a state's federal highway dollars if, under that state's laws, a person less than twenty-one years of age is permitted to purchase alcoholic beverages. See 23 U.S.C. § 158. The Court upheld the Secretary's withholding of federal funds from South Dakota under that provision, finding, inter alia, that "[t]he conditions upon which States receive the funds . . . could not be more clearly stated by Congress." 483 U.S. at 208.

Guided by those cases and the principles they exemplify, we conclude that Congress has indicated with sufficient clarity that a state risks losing all or part of its IDEA-B funds if it refuses to provide educational services to a disabled student who has been expelled or suspended for conduct unrelated to his or her disability.**12** We reach that conclusion for several reasons.

_____

**11** In light of the small sum provided under the Act, the Court concluded that it "defie[d] common sense . . . to suppose that Congress implicitly imposed this massive obligation on participating States." 451 U.S. at 24.

**12** A few other courts have reached a contrary conclusion. See Doe v. Maher, 793 F.2d 1470, 1482 (9th Cir. 1986) (stating that a state does not violate the Act if it deprives a disabled child of all educational services because of "misbehavior [that] is properly determined not to be a manifestation of his handicap"), aff'd as modified sub nom. Honig v. Doe, 484 U.S. 305 (1988) (the Supreme Court did not address the Ninth Circuit's finding in this respect); Doe v. Board of Educ., 1996 WL 79411, at *3 (N.D. Ill. Feb. 16, 1996) ("The continued provision of educational services to a student who has been expelled for reasons unrelated to a disability is not expressly required by the IDEA or its regulations, nor is there any reason to believe that Congress intended to erect an impenetra-

10

First, to the extent that <u>Pennhurst</u> is analogical authority in support of Virginia's position (as Virginia contends that it is), that case is easily distinguished. Unlike the legislation in <u>Pennhurst</u>, the statutory provision in the case at bar appears in a section that expressly imposes conditions on the receipt of federal funds, the agency charged with administering the statute believes the statute imposes the condition in question, the federal funds provided to Virginia each year (more than $50 million) are not inadequate to meet the burden imposed by that condition, and holding that that condition has indeed been imposed by Congress would not render other portions of the Act superfluous.

Second, IDEA-B's plain language leaves no room for exceptions of the kind that Virginia has asked us to read into it. The Act requires that participating states have "in effect a policy that assures all children with disabilities the right to a free appropriate public education." If a state refuses to offer educational services to a disabled child due to that child's conduct--regardless of whether that conduct is a manifestation of the child's disability--then it has ceased to assure that child of "the right to a free appropriate public education." Contrary to Virginia's belief, the statute in no way indicates that a disabled student forfeits that right when he or she misbehaves in a manner unrelated to his or her disability. The Act's unqualified language is therefore sufficiently clear to have enabled Virginia authorities to perceive that they would have to adjust their disciplinary policies for disabled students if they wished to participate in the IDEA-B program. <u>Compare Timothy W. v. Rochester, New Hampshire, Sch. Dist.</u>, 875 F.2d 954, 960-61 (1st Cir.) (rejecting the argument that, in order to demand educational services under the Act, a child must show that he or she would benefit from such services; because the Act is unequivocal and "is permeated with the words `<u>all</u> handicapped children' . . .

_____

ble shield insulating students with disabilities from the consequences of misconduct totally unrelated to their disabilities."), <u>mot. for recons. granted</u>, 1996 WL 197690 (N.D. Ill. Apr. 22, 1996) (recognizing that OSEP had taken a contrary position in an opinion letter and finding "that the positions taken by OSEP are entitled to deference"); <u>Doe v. Koger</u>, 480 F. Supp. 225, 229 (N.D. Ind. 1979) (stating that the Act "only prohibits the expulsion of handicapped children who are disruptive because of their handicap").

11

the Act in its entirety makes clear that a `zero-reject' policy is at the core of the Act"), cert. denied, 493 U.S. 983 (1989).

Third, enforcing the plain meaning of section 1412(1)--that is, holding that the word "all" does, in fact, mean "all"--need not lead to absurd results. The Department has pointed out that "the issue of whether children with disabilities may be expelled or suspended from school for misconduct unrelated to their disabilities [is wholly distinct from] the issue of whether the statute requires that continuing special educational services be provided to [such] students." IDEA-B does not prevent school officials from suspending or expelling disabled students who have misbehaved; the statute merely requires that educational services then be provided in some kind of alternative setting.**13** Elsewhere in the Act, Congress has contemplated the provision of educational services in just such alternative settings. See 20 U.S.C. § 1415(e)(3)(B)(i) (Supp. 1996) ("Except as provided in clause (iii), if the proceedings conducted pursuant to this section involve a child with a disability who is determined to have brought a weapon to school under the jurisdiction of such agency, then the child may be placed in an interim alternative educational setting, in accordance with State law, for not more than 45 days.") (emphasis added).

Fourth, we believe that upholding the Secretary's decision in the case at bar is consistent with the Supreme Court's ruling in Honig v. Doe, 484 U.S. 305 (1988). At issue in Honig was the Act's "stay-put" provision, which states that a disabled child "shall remain in [his or her] then current educational placement" until various review proceedings have been completed, unless local school officials and the

_____

**13** Virginia has concentrated on the interpretation of the phrase "all children," but we have concluded that "all" means "all" and that concentration should more appropriately be focussed on the statutory requirement of "a free appropriate public education." The right to suspend or expel for conduct unrelated to a child's disability is in no way forbidden if an alternative educational setting is provided during the period of suspension or expulsion. In addition to being the kinds of arguments more appropriately addressed to Congress than to us, many of Virginia's policy-based arguments concerning the need to allow local school officials to discipline their students in an appropriate manner are therefore largely beside the point.

child's parents agree to the contrary. See 20 U.S.C. § 1415(e)(3) (Supp. 1996). Two students who had been expelled due to "violent and disruptive conduct" arising from their disabilities, see 484 U.S. at 312-15, argued that the state could not unilaterally expel them unless those procedures had been followed. The Supreme Court agreed.**14** The Court held that the language of the statute was unequivocal, and rejected school officials' attempt "to read a `dangerousness' exception into the stay-put provision." Id. at 323. The Court disagreed with the school officials' contention "that Congress thought the residual authority of school officials to exclude dangerous students from the classroom too obvious for comment." Id. Instead, the Court reasoned as follows:

> We think it clear . . . that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. In so doing, Congress did not leave school administrators powerless to deal with dangerous students; it did, however, deny school officials their former right to "self-help," and directed that in the future the removal of disabled students could be accomplished only with the permission of the parents or, as a last resort, the courts.

Id. at 323-24. Just as the Court in Honig refused to read a "dangerousness" exception into the Act's stay-put provision, we refuse to read a "suspension or expulsion for conduct unrelated to disability" exception into the Act's requirement that "all" disabled children be assured "the right to a free appropriate public education."

III.

Virginia has argued that, by enacting IDEA-B, Congress intended merely to provide disabled children with educational opportunities equal to those enjoyed by their non-disabled counterparts. See, e.g., 20 U.S.C. § 1400(b)(3) (Supp. 1996) (stating that "more than half of the children with disabilities in the United States do not receive

_____

**14** The Court found, though, that the issue was moot as to one of the students. 484 U.S. at 317-18.

13

appropriate educational services which would enable them to have full equality of opportunity"). Finding no indication in the statute "that Congress intended to insulate special education students from the same discipline that non-disabled students may fairly incur, when they purposefully engage in <u>identical</u> misconduct unrelated to any disability," Virginia believes that the Department is attempting to give disabled students "more rights than other students" in a manner not contemplated by Congress.

We are unpersuaded by Virginia's reasoning. First, as we have indicated, the plain language of the statute supports the Secretary's finding that Congress has imposed on participating states the condition that the Department seeks to enforce against Virginia here. Second, it cannot be disputed that, in other sections of the Act, Congress has indeed granted disabled children "more rights" than those enjoyed by non-disabled children. For example, IDEA-B confers upon disabled children the right to an annually reviewed "individualized education program," prepared by the school district, the child's teacher and parents, and, when possible, the disabled child himself or herself. <u>See</u> 20 U.S.C. §§ 1401(20), 1414(a)(5) (Supp. 1996). The specific provision at issue in <u>Honig v. Doe</u>--the Act's so-called "stay put" provision, discussed <u>supra</u>--also confers unique rights upon disabled children. Any argument founded upon strict equality of treatment under the Act must therefore fail.

IV.

Virginia contends that the Department is using IDEA-B's monetary incentives "as a `club' to beat [Virginia] into submitting to [the Department's] administrative interpretation" of the statute. Virginia states that, in 1994, only about 126 of the state's 128,000 disabled children were expelled for conduct unrelated to their disabilities. By threatening to withhold Virginia's entire IDEA-B allotment, Virginia argues that the Department is exercising undue influence over the state's educational policies in violation of the Tenth Amendment[15] and general principles of federalism.

_____

[15] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

14

We should begin by noting that the plain language of the statute authorizes the Department to withhold a state's entire allotment of IDEA-B funds if the state fails to comply with the conditions expressed in the statute. See 20 U.S.C. § 1416(a) (Supp. 1996) ("Whenever the Secretary . . . finds that there has been a failure substantially to comply with any provision of section 1412 or section 1413 of this title, . . . the Secretary shall, after notifying the State educational agency, withhold any further payments to the State under this subchapter . . . .") (emphasis added). The issue at hand, therefore, is whether the Department's exercise of that delegated authority is so coercive that it violates the Tenth Amendment or principles of federalism implicit in our system of government.

Though the attachment of conditions to the receipt of federal funds generally does not amount to the kind of commandeering of the states' legislative processes that is proscribed by the Tenth Amendment, see, e.g., Dole, 483 U.S. at 210, the Supreme Court has indicated that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which [permissible] `pressure turns into [impermissible] compulsion,'" id. at 211 (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937)). As we observed earlier this year, however, "[n]o court . . . has ever struck down a federal statute on grounds that it exceeded the Spending Power." Commonwealth of Virginia v. Browner, ___ F.3d ___, 1996 WL 138507, at *9 (4th Cir. Mar. 26, 1996); see also State of Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party."), cert. denied, 493 U.S. 1070 (1990). Indeed, courts have occasionally expressed doubts with respect to whether a finding of genuine coercion can ever reliably be made. See, e.g., Steward Machine Co., 301 U.S. at 590 (ruling that no such coercion had occurred in the case then before the Court, "assum[ing] that such a concept can ever be applied with fitness to the relations between state and nation"); Skinner, 884 F.2d at 448 (identifying numerous difficulties that arise when one attempts to apply the coercion theory).

We are certain that, wherever the line separating encouragement from coercion may lie, Congress has not crossed it in the case at bar.

15

It is true that the Department has threatened to withhold all of Virginia's IDEA-B funds. Contrary to Virginia's suggestion, though, the mere fact that the federal government threatens to withhold an entire federal grant, rather than a mere portion of it (such as the five percent of federal highway dollars in <u>Dole</u>), does not necessarily compel a state to comply with the conditions attached to that grant. If the federal government were to offer education grants of a mere $1,000, for example, a state surely would not genuinely be compelled to comply with the conditions attached to that grant, even if the government threatened to withhold 100 percent of it: the sum is small enough that a state could easily choose to forego the benefits of the grant in favor of retaining policy-making independence.

In the case at bar, the Department wishes to withhold a substantial sum--more than $50 million per year. Yet that sum represents a fairly small percentage of Virginia's total expenditures for the education of disabled children. The division chief for finance at Virginia's State Department of Education testified in the proceedings below that Virginia's education expenditures for disabled children average about $9,000 per student. She also stated that Virginia currently serves approximately 128,000 disabled children and that the state's annual IDEA-B grants provide about $400 per child. Through the IDEA-B program, therefore, the federal government is providing approximately five percent of the funds needed to educate Virginia's disabled children. While we do not doubt for a moment that the loss of those funds would be sharply felt, we cannot say that the federal government is providing such a significant proportion of the funds needed by Virginia that the state has no choice but to comply with the conditions attached to receiving the federal dollars. We reject Virginia's coercion argument accordingly.

V.

Virginia has argued that, even if the Department has properly construed the provisions of IDEA-B, it may not enforce that interpretation of the Act against Virginia because it has acted by way of a "legislative rule," rather than an "interpretive rule," and therefore must abide by the notice and comment provisions of the APA. Virginia has also pointed out that, under 20 U.S.C. § 1417(b), the Secretary was required to "issue, not later than January 1, 1977, . . . such

16

rules and regulations as may be necessary" to "carry[ ] out the provisions of this subchapter" and that "[n]o other less formal method of implementing such provisions is authorized."

An agency issues an "interpretive rule" when it "simply states what [it] thinks the statute means, and only reminds affected parties of existing duties." General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (quotation omitted), cert. denied, 471 U.S. 1074 (1985). An agency issues a "legislative rule" when it "intends to create new law, rights or duties." Id. Unlike interpretive rules, legislative rules have the force of law; consequently, when an agency issues a legislative rule, it must abide by the notice and comment procedures mandated by the APA. Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1340 (4th Cir. 1995); see 5 U.S.C.§ 553.

The Seventh Circuit has addressed the precise issue raised in the instant case. In Metropolitan School District of Wayne Township v. Davila, 969 F.2d 485 (7th Cir. 1992), cert. denied, 507 U.S. 949 (1993), the Ohio Department of Education's director of special education had asked OSERS whether IDEA-B "requires states to provide educational services to disabled children who are expelled or suspended for an extended period for reasons unrelated to their disability." Id. at 487. OSERS had responded by way of a letter, indicating that it believed IDEA-B did indeed require such continuation of services. Id. An Ohio school district filed suit, contending that OSERS had issued a legislative rule and that the agency therefore needed to comply with the APA's notice and comment requirements for issuing such rules. Id. The Seventh Circuit ruled in favor of the Department of Education. The court determined that OSERS had merely issued an interpretive rule, relying upon the statutory language and the legislative history in an effort to determine what Congress intended. Id. at 492.

We find the Seventh Circuit's reasoning persuasive. The Department has simply told Virginia what it believes IDEA-B requires; it has not attempted to create new rights or duties. Consequently, we find that the agency has issued an interpretive rule and that the notice and comment requirements of the APA are inapplicable. We similarly reject Virginia's argument that 20 U.S.C. § 1417(b) required the

17

Department to employ more formal procedures when it attempted to enforce the plain language of IDEA-B.

VI.

For the foregoing reasons, we uphold the Secretary's final decision.

AFFIRMED

LUTTIG, Circuit Judge, dissenting:

For misconduct wholly unrelated to their disabilities, the Commonwealth of Virginia disciplines its handicapped students in the identical manner that it does its non-handicapped students. Believing that students -- handicapped or not -- who so completely disrupt the classroom as to prevent the educational process to continue or who actually commit serious crimes against society forfeit by their own misconduct their right to a free education, the Commonwealth expels such students from its classrooms until such time as they are willing to conform their behavior to that necessary for education to occur. During the period of expulsion, as part of the State's overall program for discipline in its public schools, the State allows its local school boards to suspend educational services to the expelled students. That is, for neither expelled handicapped nor expelled non-handicapped students does the Commonwealth require its local school boards to provide private tutors or other educational alternatives following expulsion, whether the expelled student finds himself in prison, in detention, or at home. Explaining its reasons for this policy, the State says: "[A] caring public school organization . . . applies this discipline as a last resort `wake-up' call of accountability." Br. at 9. And, within the Commonwealth, this disciplinary tool has proven to be one of the most effective means of instilling a sense of personal responsibility and accountability in the few obstinately antisocial among the State's youths. Indeed, the experience of the State is that "it is rare for an expelled student, when readmitted [which most are], to be expelled again." Id. at 11.

Bringing the full weight of the Federal Government to bear against the Commonwealth's educational policy decision not to require pri-

18

vate tutors in prisons and elsewhere for students who have committed serious crimes or otherwise so disrupted the educational process as to require their expulsion, the Department of Education has, in the first such enforcement action ever against a state, withheld Virginia's entire $60 million annual Individuals with Disabilities Education Act ("IDEA") grant until the Commonwealth capitulates to the Department's demands that it provide private educational services to these expelled handicapped students, 126 in number. This, notwithstanding that the State continues to provide education to the some 128,000 handicapped students who have not abused the educational opportunity provided them through the cooperative efforts of the Commonwealth and the United States, including those handicapped students whose misconduct warrants expulsion but who are not expelled because their misconduct relates to their disabilities.

In an argument that only the Federal Government could make, and which the majority uncritically accepts, the Department of Education and the Department of Justice contend that the State's refusal to provide private tutors for handicapped students expelled for criminal or other serious misconduct unrelated in any way to their disabilities violates the condition on Virginia's receipt of IDEA funds to "assure[ ] [to] all students with disabilities the right to a free appropriate public education." According to the Departments of Justice and Education, both the statute and sound policy require the States to provide private tutors, at taxpayer's expense, even to convicted murderers:

> THE COURT: Does the Department of Education take the view that if a disabled young person commits a felony murder and is incarcerated, then the State is still obligated to provide that person with an education?
>
> COUNSEL: Yes, I believe that the statute specifically contemplates the provision of special education services even in institutions . . . .
>
> THE COURT: So the State has to go in and provide a tutor to this felony murderer. That's the Department of Education's view?

19

COUNSEL: Yes.

Oral argument, April 4, 1996.

In order to require the States to provide private education to students expelled for reasons unrelated to their handicaps, and thus commandeer from the States their core function of ensuring order and discipline in their schools, Congress would have had to have spoken in affirmative and unambiguous terms, so that there could be no question whatsoever of its intent. Not only did the Congress not unambiguously require the States to provide the continuing education at issue, it all but codified the common sense proviso that such an education need not be extended to such students.

Because the majority, in holding that the States must yield to the Department of Education's demands, places this court's imprimatur on what I believe to be an unauthorized, if not unconstitutional, exercise of federal authority over matters peculiarly within the province of the States and reserved to them by the Tenth Amendment to the Constitution, I dissent.

I.

A.

The Secretary of Education and the Assistant Attorney General acknowledge, as they must, that IDEA at most only implicitly conditions the States' receipt of funds upon the continued provision of educational services to students expelled for misconduct unrelated to their handicaps. See Decision of the Secretary, Proposed Withholding Proceeding, Docket No. 94-76-0, at 5 (July 3, 1995) ("[T]he IDEA does not contain explicit language which precludes the cessation of education services for disabled children who are suspended long-term or expelled for misconduct unrelated to their disability."); Respondent's Br. at 34, 35 n.11 (conceding that the condition the Secretary seeks to impose is only "implicit"). Because we are here concerned with a congressional conditioning of the States' receipt of federal funds, this acknowledgment is itself sufficient basis upon which to reject the Federal Government's argument that the States are required

20

to continue providing educational services to these expelled students, as I discuss infra. For, in order for the States to be bound by a condition upon the receipt of federal monies, the Congress must have affirmatively imposed that condition in clear and unmistakable statutory terms. An adjustment to the critical balance of power between the Federal Government and the States cannot be authorized implicitly.

But, before turning to the question of whether IDEA satisfies the heightened standard applicable to federal statutes that affect the distribution of power between the Federal Government and the States, it should be understood that IDEA does not impose, implicitly or otherwise, the condition for which the Federal Government argues, under even ordinary standards of statutory construction. The relevant provision of the IDEA does not require that the States have in effect "a policy that assures all handicapped children a free appropriate public education" -- a condition which, in my view, still would not require the States to provide education to handicapped children expelled for misconduct having nothing whatever to do with their disabilities. Rather, it requires that, in order to qualify for federal special education funds, the States "ha[ve] in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1) (emphasis added). Thus, as the Supreme Court has repeatedly observed, see discussion infra, the statute only requires that the States provide handicapped children with access to such an education. And, as with any other right, that right of access to educational services may be forfeited by criminal or other conduct antithetical to the right itself. A state, accordingly, no more fails to satisfy the statute's condition when it refuses to continue educational services to a student who has forfeited his right to such services, than when it does not provide an education to a student who chooses not to avail himself of the opportunity at all.

The majority errs in its interpretation of the statute precisely because it ignores the key phrase "the right to," and instead focuses exclusively upon the word "all." See, e.g., ante at 12 n.13 ("Virginia has concentrated on the interpretation of the phrase`all children,' but we have concluded that `all' means `all' and that concentration should more appropriately be focussed on the statutory requirement of `a free appropriate public education.'"). In doing so, of course, the majority entirely begs the question we must decide in order to resolve this

21

case. It is indisputable that, as a condition to receipt of the special education funds, the States must have in place a policy that assures "all" handicapped children something; the question is, what is that something. And it could not be clearer from the face of the statute that that something is only "the right to" a free appropriate public education. If this were not evident from the statute's language, then it should be evident from the derisible result that follows upon the alternative interpretation -- that the States are required, at taxpayers' expense, to dispatch to prisons, jails, and personal residences, private tutors to instruct those students who have so disrupted the classroom that their own instruction and that of their fellow students was rendered impossible.

Of course, the Commonwealth of Virginia has in effect the precise policy required by the statute. Virginia extends to every handicapped school-age child within the Commonwealth the right to a free public education appropriate to his disabilities. What it does not do -- and understandably -- is require that local school boards discipline their handicapped students (for conduct unrelated to their disabilities) differently from their non-handicapped students, and provide educational services even to those handicapped youths who have forfeited the right to a free education by wilfully engaging in contumacious conduct so serious as to warrant the ultimate discipline of expulsion. See Regulations Governing Special Education Programs for Children with Disabilities in Virginia, § 3.3(B)(11)(b)(4) ("If there is no causal connection [between the misconduct and the disability] and if the child was appropriately placed at the time of the misconduct, the child may be disciplined the same as a nondisabled child.").**1** And nothing in the

_____

**1** Because of the procedural requirements IDEA imposes upon the States before any change in placement of a disabled student can be effected, including the requirement that the States prove that the misconduct was wholly unrelated to the student's disability, expulsion of a disabled student actually is, as a practical matter, considerably more difficult than expulsion of a non-handicapped student. See, e.g., 20 U.S.C. §§ 1415(b)(1)(D), 1415(b)(1)(E), 1415(b)(2), 1415(c), 1415(e)(2); Board of Educ. v. Rowley, 458 U.S. 176, 182 (1982) ("[T]he Act imposes extensive procedural requirements upon States receiving federal funds under its provisions.").

As the Commonwealth recounts the process attending the expulsion of one handicapped student:

22

language of IDEA even purports to condition the Commonwealth's receipt of IDEA's special education funds upon the State's submission to the Federal Government's inexplicable demand that it now do so.

Nor does anything in the purpose of IDEA suggest that the State is required to succumb to the Federal Government's demands. The express, codified purpose of the IDEA is "to assure that all children with disabilities have available to them . .. a free appropriate public education which emphasizes special education and related services

_____

> 1. Student with Attention Deficit/Hyperactivity Disorder "ADHD" brought knife to school hidden in his boot. The knife was reported by a female student who alleged he had brought the knife on other occasions and had threatened to stab her. When questioned he denied having the knife, refused to untie his boot, told officials they had no right to search him, but eventually surrendered the knife. The student knew the consequences of being discovered would probably be expulsion.
>
> 2. The first causality committee concluded there was no causal connection between the conduct and the disability.
>
> 3. The parents sought reconsideration and a second causality committee was convened. It concluded there was no causal relationship.
>
> 4. A discipline review committee was then held to review the recommended long-term suspension. This committee upheld the long-term suspension.
>
> 5. Parents sought a "due process" hearing.
>
> 6. First level hearing officer found no causal connection.
>
> 7. Second level hearing officer also found no causal connection.
>
> 8. The incident occurred when the student was 15 and, despite the IDEA-B stringent time-lines, the due process appeals took eight months.

Petitioner's Br. at 36 n.21. Even after these procedural steps were taken, the parents and the disabled student still had the right to challenge the disciplinary action in state or federal court. See 20 U.S.C. § 1415(e)(2).

23

designed to meet their unique needs . . . [and] to assist States and localities to provide for the education of all children with disabilities . . . ." 20 U.S.C. § 1400(c) (emphasis added). As the Supreme Court has recognized, the statute's purpose was to ensure that disabled students are not denied access to a free public education because of their disabilities, or because of misconduct related to their disabilities. See Board of Educ. v. Rowley, 458 U.S. 176 (1982) (referring repeatedly to the purpose of the Act as one giving handicapped children access to public education); id. at 214 (White, J., dissenting) ("[T]he Act intends to give handicapped children an educational opportunity commensurate with that given other children.");[2] Honig v. Doe, 484 U.S. 305 (1988). The statute was enacted "to open the door of public education" to handicapped students, Rowley, 458 U.S. at 192, one million out of eight million of whom had been excluded from school systems across the country because of their disabilities, id. at 189, many through the pretextual use of discipline, see Honig, 484 U.S. at 324.

Not only is there nothing in this laudable purpose of IDEA that would require the continued provision of educational services to handicapped students expelled for reasons unrelated to their handicap, the statutory purpose is fully achieved by interpreting the language so as not to require such, thereby reserving to the States, in the manner urged by the Commonwealth, their historical responsibility for the discipline of their schoolchildren. As even the Ninth Circuit held in Doe v. Maher, 793 F.2d 1470 (9th Cir. 1986), aff'd as modified sub nom., Honig v. Doe, 484 U.S. 305 (1988), in a portion of its opinion notably left undisturbed by the Supreme Court in Honig:[3]

_____

[2] See also Rowley, 458 U.S. at 199 (referring to caselaw upon which Congress expressly relied in enacting IDEA as enunciating a "right of access to free public education"); id. at 200 ("[N]either the Act nor its history persuasively demonstrates that Congress thought that equal protection required anything more than equal access."); id. ("Desirable though [the goal of maximizing each handicapped child's potential] might be, it is not the standard that Congress imposed upon States which receive funding under the Act. Rather, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education.").

[3] Although the Department of Justice maintains that Honig effectively decided the question we confront, the Secretary of Education, as does

24

> If the child's misbehavior is properly determined <u>not</u> to be a manifestation of his handicap, the handicapped child can be expelled. This conclusion does not conflict with the [IDEA]. When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. <u>Therefore, when a handicapped child is properly expelled, the school district may cease providing all education services -- just as it could in any other case.</u> To do otherwise would amount to asserting that all acts of a handicapped child, both good and bad, are fairly attributable to his handicap. We know that that is not so.

<u>Id</u>. at 1482 (emphasis added, footnote and citations omitted); <u>see also</u> <u>Doe</u> v. <u>Board of Educ.</u>, 1996 WL 79411, at *3-4 (N.D. Ill. Feb. 16, 1996);**4** <u>Doe</u> v. <u>Koger</u>, 480 F. Supp. 225, 229 (N.D. Ind. 1979).

_____

even the majority, recognizes that it did not. <u>See</u> Decision of the Secretary, <u>supra</u>, at 6 (noting that an expulsion for conduct unrelated to disability is "the circumstance left unaddressed by <u>Honig</u>"); <u>ante</u> at 12 ("[U]pholding the Secretary's decision in the case at bar is <u>consistent with</u> the Supreme Court's ruling in <u>Honig</u> v. <u>Doe</u>." (emphasis added)); <u>see also Metropolitan School District</u> v. <u>Davila</u>, 969 F.2d 485, 493 (7th Cir. 1992) ("<u>Honig</u> did not reach this issue."), <u>cert</u>. <u>denied</u>, 507 U.S. 949 (1993). The Court in <u>Honig</u> addressed only the question of whether school districts could unilaterally change the placement of disabled students for "dangerous or disruptive conduct growing out of their disabilities." 484 U.S. at 308; <u>see also id</u>. at 312 ("The present dispute grows out of the efforts of [school officials] to expel two emotionally disturbed children from school indefinitely for violent and disruptive conduct <u>related to their disabilities</u>." (emphasis added)). To the extent that the Court's opinion can be read to speak to the issue now before us, it suggests, given the Ninth Circuit's holding quoted above, that the States are <u>not</u> required to continue to provide educational services to students expelled for conduct unrelated to their handicaps. <u>Id</u>. at 328.

**4** The district court in <u>Doe</u> subsequently agreed to reconsider its decision, noting that the Department of Education's contrary interpretation of the statute, of which it had only recently become aware, was entitled to deference. <u>See</u> 1996 WL 197690, at *2 (N.D. Ill. Apr. 22, 1996). As I

That the Department of Justice, in what is emerging as a pattern of deceptively selective quotation that threatens to undermine in this court and others the traditional respect accorded the Department, see, e.g., Thomasson v. Perry, 80 F.3d 915, 939-41 (4th Cir. 1996) (Luttig, J., concurring), believes it necessary to omit the phrase "the right to" on virtually every occasion when it recites the statute's requirement that the States "assure[ ] all children with disabilities the right to a free appropriate public education,"**5** only confirms that it likewise understands that Congress has not conditioned the States' receipt of federal funds upon the continued provision of education to expelled students, or, at the very least, that it understands Congress has not done so with the clarity required for the appropriation of a core state function. There would be no other reason for such intentional omission of these three manifestly relevant (even if, in one's view, not dispositive) words from the short, thirteen-word provision before us.

_____

explain infra, because of the applicability of the "clear statement" rule, the deference that we ordinarily afford agency interpretations of ambiguous statutes is inapplicable in a case such as this. Thus, I would expect the district court's original decision to be reaffirmed.

**5** In the first substantive sentence of its "Summary of Argument," for example, the Assistant Attorney General writes that, "[t]he IDEA unambiguously requires participating states, as a condition of receiving federal funds, to assure that a free appropriate public education is provided to `all children with disabilities.'" Respondent's Br. at 15 (selectively quoting 20 U.S.C. § 1412(1)). In the first sentence of its "Argument," the Assistant Attorney General, again selectively quoting from section 1412(1), claims that "[t]he language of the IDEA is unambiguous: participating states must assure that a free appropriate public education is available to `all children with disabilities.'" Id. at 17. And throughout the Department's submissions, the same omission is made. See id. at 16 ("[T]he statute mandates provision of special educational services to `all' children with disabilities."); id. at 25 ("[Congress] has declined to override the IDEA's mandate that special education services be provided to all children with disabilities."); id. at 34 ("[The condition] is necessarily implicit in the IDEA's requirement that a free appropriate public education be provided to all children with disabilities."); id. at 36 ("The requirement that states provide special education services to all children with disabilities, including those under disciplinary suspension or expulsion, is clear and specific.").

26

B.

Whether the majority's interpretation of the statute or that which I believe Congress intended is the better, however, is not even the question. The question is whether, in unmistakably clear terms, Congress has conditioned the States' receipt of federal funds upon the provision of educational services to those handicapped students expelled for misconduct unrelated to their handicap: "[I]f Congress desires to condition the States' receipt of federal funds, it `must do so unambiguously . . . .'" South Dakota v. Dole, 483 U.S. 203, 207 (1987) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)).**6** Indeed, the Supreme Court itself invoked Pennhurst's clear statement rule in addressing the identical provision of the IDEA at issue here, reasoning that it is a "fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously." Rowley, 458 U.S. at 190 n.11 (citing Pennhurst, 451 U.S. at 17). If Congress has not unequivocally conditioned receipt of federal funds in the manner claimed by the Department of Education, and by the Department of Justice on its behalf, then our inquiry is at an end.

Insistence upon a clear, unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner is especially important where, as here, the claimed

_____

**6** Cf. Will v. Michigan Dep't of State Police, 491 U.S. 58, 65 (1989) (describing as an "ordinary rule of statutory construction" the principle that "if Congress intends to alter the `usual constitutional balance between the States and the Federal Government,' it must make its intention to do so `unmistakably clear in the language of the statute.'" (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985), and citing Pennhurst, 465 U.S. at 99)); Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) ("[Where] [c]ongressional interference [with a core state function] would upset the usual constitutional balance of federal and state powers[,] . . . `it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." (quoting Atascadero, 473 U.S. at 243, and citing Pennhurst, 465 U.S. at 99)); Torcasio v. Murray, 57 F.3d 1340, 1344-46 (4th Cir. 1995) (holding that "Congress must speak unequivocally before [courts] will conclude that it has `clearly'" intruded upon core state functions), cert. denied, 116 S. Ct. 772 (1996).

condition requires the surrender of one of, if not the most significant of, the powers or functions reserved to the States by the Tenth Amendment -- the education of our children. See, e.g., Honig, 484 U.S. at 309 ("[E]ducation [is] `perhaps the most important function of state and local governments.'" (quoting Brown v. Board of Educ., 347 U.S. 483, 493 (1954))); Milliken v. Bradley, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."); United States v. Lopez, 115 S. Ct. 1624, 1632 (1995) ("[Education is an area] where States historically have been sovereign."). In this context, we in the judiciary labor under a special obligation to "assure[ ] that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United States v. Bass, 404 U.S. 336, 349 (1971); see also, e.g., Gregory, 501 U.S. at 461 (quoting Bass); Will, 491 U.S. at 65 (same); Torcasio, 57 F.3d at 1344 (same).

The Department of Justice argues, in what I understand as a concession, and the majority accepts, in what I understand as an admission, that in the event of ambiguity in the IDEA provision at issue, we defer to a reasonable interpretation by the agency, as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States.[7] We do not. It is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted. As the Court stated in Gregory v. Ashcroft:

> [I]nasmuch as this Court in Garcia [v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985)] has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must

_____

[7] See ante at 6 n.4 (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45 (1984)); cf. Respondent's Br. at 26 ("Even if the statute were ambiguous on this point, however, the Secretary's interpretation of the statute's requirements is reasonable and entitled to substantial deference."); id. at 16 ("The only issue is whether the Secretary's interpretation of [section 1412(1)] is reasonable.").

28

be absolutely certain that Congress intended such an exercise. "[T]o give the state-displacing weight of federal law to mere congressional _ambiguity_ would evade the very procedure for lawmaking on which _Garcia_ relied to protect states' interests."

501 U.S. 452, 464 (1991) (quoting L. Tribe, American Constitutional Law § 6-25, p. 480 (2d ed. 1988)).

Applying the clear statement rule with the required solicitude for the rights of the States in our federalist system, it is apparent that Congress has not spoken through the IDEA with anywhere near the clarity and the degree of specificity required for us to conclude that the States' receipt of special education funds is conditioned upon their continued provision of education to handicapped students expelled for criminal activity or other misconduct unrelated to their disabilities. The majority is unable to cite to a single word from the statute or from the legislative history of IDEA evidencing that Congress even considered such a condition, much less that it confronted the possibility of such a condition and its implications for the sovereignty of the States, and determined to condition the States' funds in this manner. As the Departments of Education and Justice themselves acknowledge, at most the statute _implicitly_ conditions the receipt of funds in the manner they contend. And, as I explain above, it does not even do this; indeed, the better interpretation of the statutory language is that Congress only required the States to provide handicapped children with access to an education, reserving to the States -- intentionally or otherwise -- the authority to discipline handicapped students as they deem appropriate, for criminal actions and misconduct unrelated in any way to those students' disabilities.

The majority appears to believe that merely because section 1412 indisputably sets forth conditions on the States' receipt of IDEA funds, see 20 U.S.C. § 1412 ("In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Secretary that the following _conditions_ are met: . . . ." (emphasis added)), Congress has _ipso facto_ spoken sufficiently clearly to satisfy the clear statement requirement. However, in _Gregory_, the Supreme Court rejected this very understanding of the clear statement requirement in a holding that should control the disposition of the case before us.

29

There, the Court held that the Age Discrimination in Employment Act, which covered employees of "a State or political subdivision of a State," 29 U.S.C. § 630(b)(2) -- a provision that under today's majority opinion would seem unambiguously to cover state judges -- did <u>not</u> apply to state judges because the provision did not unambiguously reveal that Congress intended such a result. In reaching this conclusion, the Court reasoned that a clear statement is required not simply in determining whether a statute applies to the States, but also in determining whether the statute applies in the particular manner claimed. <u>Gregory</u>, 501 U.S. at 460-70. In fact, Justices White and Stevens declined to join the "clear statement" discussion in Justice O'Connor's opinion for the Court <u>because</u> it adopted the position urged by the Commonwealth and rejected by the majority in this case:

> [T]he majority nevertheless imposes upon Congress a "plain statement" requirement. The majority claims to derive this requirement from the plain statement approach developed in our Eleventh Amendment cases . . . . The issue in those cases, however, was whether Congress intended a particular statute to extend to the States <u>at all</u>. . . . In the present case, by contrast, Congress has expressly extended the coverage of the ADEA to the States and their employees. Its intention to regulate age discrimination by States is thus "unmistakably clear in the language of the statute." <u>Atascadero</u>, [473 U.S.] at 242. . . . The only dispute is over the precise details of the statute's application. We have never extended the plain statement approach that far . . . .

<u>Id</u>. at 475-76 (White, J., concurring in part, dissenting in part, and concurring in the judgment); <u>cf</u>. <u>id</u>. at 493 (Blackmun, J., joined by Justice Marshall, dissenting) (arguing that <u>Chevron</u> deference, rather than clear statement rule, was appropriate).

Since neither the text of section 1412(1), the legislative history, nor the purpose of the IDEA even suggests, much less mandates with the clarity necessary to confirm that the Congress actually confronted and deliberately decided, that a state must continue to provide education services to disabled children after expulsion for misconduct unrelated to their disabilities, I would reject the Department of Education's new

30

interpretation to the contrary as <u>ultra vires</u>.**8** I would hold that the Commonwealth of Virginia fulfills its statutory obligations under section 1412(1) by affording all disabled students the right to a free appropriate public education -- a right that disabled students, like non-disabled students, can forfeit by criminal activity or serious misconduct unrelated to their disabilities.**9** While the States are free, in Faustian fashion, to surrender unto the Federal Government that which separately defines them as powers autonomous from that Government, it is plain that they have not done so in this instance. Nor, for that matter, has the Congress sought to exact such an abnegation from them. Indeed, I would be astonished if the Congress of the United States was even aware that the Departments of Education and Justice are contending otherwise before this court.

_____

**8** The Department of Education did not even arrive at the interpretation of section 1412(1) that it advances in this litigation until 1989, fifteen years after passage of IDEA. <u>See</u>, <u>e.g.</u>, <u>Virginia Dep't of Educ.</u> v. <u>Riley</u>, 23 F.3d 80, 85-86 (4th Cir. 1994) (describing the Department's 1989 interpretation as a "new condition" on funding); Decision of the Secretary, <u>supra</u>, at 1 n.1 (referring to the 1989 interpretation as a "`new condition' of compliance"); <u>id</u>. ("The Hearing Officer also found that the Department's enforcement of IDEA-B, <u>while neither uniform nor constant, was not arbitrary or capricious</u> . . . ." (emphasis added)).

**9** I would categorically reject the Department's byzantine alternative argument, which it briefed but abandoned at oral argument, that the policy outlined in the Department's interpretive letter has itself been incorporated into the statute by virtue of section 314(b) of the Improving America's Schools Act of 1994, Pub. L. 103-382, <u>reprinted in</u> 20 U.S.C. § 8921 note. That uncodified section provides that the stay-put provision of the IDEA "shall be interpreted in a manner that is consistent with the Department's final guidance concerning State and local responsibilities under the Gun-Free Schools Act of 1994." 20 U.S.C. § 8921 note. The portion of the guidance memorandum upon which the United States relies interprets other provisions of the IDEA, not the stay-put provision. <u>See</u> U.S. Dep't of Educ., Guidance Concerning State and Local Responsibilities Under the Gun-Free Schools Act of 1994, at 3, <u>reprinted in</u> J.A. at 219 ("[T]he IDEA requires that educational services must continue, although they may be provided in another setting, for students with disabilities who are properly expelled."). Accordingly, this portion of the Department of Education's memorandum has not been elevated to statutory law.

31

II.

Because I interpret section 1412(1) of IDEA so as not to impose upon the States the condition that they provide private tutors and other alternative educational services to handicapped students expelled for egregious conduct unrelated to their disabilities, I need not resolve the Tenth Amendment issue that is presented upon the contrary reading of the statute. Suffice it to say, however, that I regard that issue as considerably more substantial than does the majority, which all but rejects it out of hand.

I recognize that the Court has not invalidated an Act of Congress under the Spending Clause since United States v. Butler, 297 U.S. 1 (1936), over half a century ago. But cf. United States v. Lopez, 115 S. Ct. 1624 (1995); Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996). However, as Chief Justice Rehnquist, on behalf of the Court, recently reminded in South Dakota v. Dole, 483 U.S. 203 (1987), "[the Court's] decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which `pressure turns into compulsion,'" id. at 211 (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937)), "in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government," Steward Machine Co., 301 U.S. at 585.

The Court in Dole rejected South Dakota's argument that the Federal Government's condition that the State raise its drinking age for all consumers to 21 was impermissibly coercive. In that case, however, Congress had directed that the States "lose[only] a relatively small percentage of certain federal highway funds" for their noncompliance. 483 U.S. at 211. Because "all South Dakota would lose if she adhere[d] to her chosen course as to a suitable minimum drinking age [was] 5% of the funds otherwise obtainable" under the program, the Court concluded that Congress had but "offered relatively mild encouragement to the States to enact higher minimum drinking ages." Id.

Here, in stark contrast, the Federal Government has withheld from the Commonwealth 100% of an annual special education grant of $60 million because of the Commonwealth's failure to provide private

32

educational services to less than one-tenth of one percent (126) of the 128,000 handicapped students for whom the special education funds were earmarked. And it has withheld the entirety of this $60 million grant -- only $58,000 of which would, on a pro rata basis, be available for educational services to the 126 expelled students -- because the State refused to surrender control over its own classrooms and schoolchildren by abandoning one of its most effective tools for maintaining order and discipline, see, e.g., Goss v. Lopez, 419 U.S. 565, 580 (1975) ("Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device."). As even the Department of Education concedes, under the interpretation of the statute embraced by the court today, "Congress [has] drastically curtailed local autonomy with respect to discipline and denial of educational services to this group of children" "[a]s a condition of receiving federal funds." Respondent's Br. at 38.

This is a condition considerably more pernicious than the "relatively mild encouragement" at issue in Dole. Withholding the $58,000 pro rata amount of the funds that would be used by the State to provide services to the 126 expelled students whom the Federal Government believes are entitled to educational services under the statute would be "encouragement." The withholding of almost $60 million from the State and from the 128,000 disabled students who have responsibly availed themselves of their educational opportunity, simply because the State refuses to yield to the federal demands as to the 126 students who have abused their rights, begins to resemble impermissible coercion, see Dole, 483 U.S. at 211, if not forbidden regulation in the guise of Spending Clause condition, as well, see id. at 212, 215-218 (O'Connor, J., dissenting); Butler, 297 U.S. at 73 ("There is an obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced.").

Neither of the majority's two efforts to escape the import of Dole's reasoning succeeds. The percentage of the total monies expended by the State for education of the handicapped that is represented by the federal grant is irrelevant in assessing the coerciveness of the inducement, at least as appears from the Court's opinion in Dole. Were it otherwise, the same federal grant in the same amount would be

33

unconstitutionally coercive as to one State, but not as to another which expends a greater amount for the purposes served by the grant; indeed, were it otherwise, there would be created a perverse incentive for the States to spend less in areas in which they expected to receive federal monies, in order to render more vulnerable under the coercion theory any conditions that were imposed. Thus, the majority's effort to compare the 100% withholding here to the 5% withholding in Dole, by noting that the $60 million in special education funds constitutes only "approximately five percent of the funds needed to educate Virginia's disabled children," ante at 16; compare Respondent's Br. at 43 (claiming that the federal grant "provides at most nine percent of the cost of providing special educational services to children with disabilities"), is to no avail. Equally unavailing is the majority's effort to avoid the import of Dole by observing that a 100% withholding of a "mere $1,000" education grant would not be unduly coercive. The difference between a $1000 grant and, as here, a $60 million grant, insofar as their coercive potential is concerned, is self-evident.

The argument made by counsel for the Department of Justice is no more responsive to the constitutional barrier recognized by Dole than are the majority's. In contending that the withholding is not coercive, counsel emphasized that there were more coercive steps that might have been taken, such as the withholding of all federal funds from the Commonwealth. Sending in the troops would be more coercive still, but the existence of that more coercive alternative does not render the withholding to which the Commonwealth is subject noncoercive.

Ultimately, if the Court meant what it said in Dole, then I would think that a Tenth Amendment claim of the highest order lies where, as here, the Federal Government (accepting the majority's interpretation of the statute) withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign States. In such a circumstance, the argument as to coercion is much more than rhetoric; it is an argument of fact. See Dole, 483 U.S. at 211. It is, as well, an argument that the Federal Government has, in an act more akin to forbidden regulation than to permissible condition, supplanted with its own policy preferences the considered judgments of the States as to how best to instill in their youth the sense

34

of personal responsibility and related values essential for them to function in a free and civilized society. As such, it is an argument well-grounded in the Tenth Amendment's reservation "to the States respectively, or to the people" of those "powers not delegated to the United States by the Constitution, nor prohibited by it to the States."

* * * * *

In the end, this case is about the permissible reach of federal power under the Spending Clause in a time when the several States have become increasingly dependent upon the Federal Government for funds, because the Federal Government has increasingly become dependent upon the revenues from taxation it receives from the citizens of the several States. In particular, it is about the extent to which the Federal Government may, in our system of federalism, impose its policy preferences upon the States by placing conditions upon the return of revenues that were collected from the States' citizenry in the first place. As Justice O'Connor aptly observed in Dole:

> If the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives "power to the Congress to tear down barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." [Butler, 297 U.S. at 78]. This, of course, as Butler held, was not the Framers' plan and it is not the meaning of the Spending Clause.

483 U.S. at 217.

According to counsel for the Department of Education, requiring the States to continue to provide educational services to handicapped students expelled for reasons unrelated to their handicaps "make[s] sense, as a matter of policy, in light of the broad purposes of the statute[,] . . . [and] allow[ing] individual school districts in their sole discretion to decide whether or not to deny services to this significant number of children with disabilities . . . would . .. inflict lasting harm on these children."

35

The Commonwealth of Virginia, for its part, steadfastly maintains not only that the Department's policy is misguided, because it deprives the State of its most effective disciplinary and instructional tool for instilling in its especially recalcitrant students the sense of responsibility they so sorely lack, but that it is, in any event, a policy decision uniquely reserved to the States by the Constitution. And the wisdom of the Commonwealth's policy is certainly borne out by the testimony of the State's local educators and administrators. In testimony that speaks volumes, Jane Timian, the Hearing and Legal Assistant for the Fairfax County School Board responsible for overseeing all student disciplinary matters, described as follows two illustrative incidents that have recently taken place in the Commonwealth as a consequence of the Education Department's policy:

> In a recent case at one of FCPS' 23 high schools, six students were part of a group of students whose actions resulted in a loaded .357 magnum handgun being recovered in the school building. The non-special education students were expelled. One student, however, was identified as "learning disabled" due to the student's weakness in written language skills. An IEP team reviewed extensive evaluations and unanimously found no causal relationship between the student's writing disability and the student's involvement in the weapons violation. The student was not expelled. The student later bragged to teachers and students at the school that he could not be expelled.
>
> In another recent case at a different high school, a student gang which had adopted a specific name was involved in a mob assault of another student. One student involved in the melee used a meat hook as a weapon. Three of the gang members were expelled. The other two members of the gang were special education students who have not been expelled and who are still receiving services.

J.A. at 177. And confirming what anyone even remotely familiar with public education today would have expected, Lucille Brown, Superintendent of Richmond City Public Schools, testified that the "`home-bound instruction' and `alternative education'[after expulsion]" that has been required by the Federal Government's Department of Educa-

36

tion has "become just another `badge of honor' flaunted by students who have bested the public schools again." Petitioner's Br. at 10.

In our federal system of government, such delicate policy decisions, relating so intimately as they do to matters within the exclusive prerogative of the States, are presumed to be those of the States alone. If the Federal Government intends to expropriate these or other sovereign rights from the States, it must at least do so affirmatively and unambiguously, so that its design is known and the States may marshal their political will in opposition to that expropriation. Even then, of course, the Federal Government must effectuate that expropriation in a manner that is faithful to the limitations on Federal power that inhere in the Tenth Amendment and in the principles of federalism that undergird our entire democratic system of governance. Only when the Government acts within these limitations can one have confidence both that the United States has deliberately determined to subordinate the rights of the States to the interests of the Federal Government and that it has done so consistently with the constitutional limitations that even today constrain the Federal Government as against the People.

In my view, certainly the first, and perhaps the second, of these essential limitations on Federal power has been exceeded in the IDEA provision, at least as it is interpreted by the court today. And with these excesses has come, as always, yet a further incremental, but no less significant, incursion into the sovereign authority of the several States. As counsel for the Federal Government responded, after reflecting for a moment on the court's question whether the Department of Education was not simply saying to the States that it knows better than they what is good for America's schoolchildren and then imposing that view on the States: "Well your honor, in a sense, that's what Congress is doing in this whole statute." Unwilling to acquiesce in such a pretentious arrogation of state power, I dissent.

37